**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **TRAVELERS CAS. & SUR. CO. OF AM.,** | |
| **Plaintiff, Counter Defendant,** | **CIVIL NO. 18-1795 (GAG)** |
| **v.** | |
| **ALBERTO VÁZQUEZ COLÓN; HILDA PIÑEIRO CÁCERES; CARLOS GONZÁLEZ TORRES; IVETTE GÓMEZ DÍAZ; MIGUEL BERMÚDEZ CARMONA; ALUMA CONSTR. CORP.; VIEQUES CONCRETE MIX CORP.; INTER-ISLAND FERRY SYS. CORP.; VIEQUES F.O.& G INC., and; PUERTO RICO AQUEDUCTS AND SEWER AUTH.; et al.,** | |
| **Defendants, Cross Claimants, Counter Claimants, Cross Defendants.** | |

## OMNIBUS OPINION & ORDER

Travelers Casualty & Surety Company of America ("Travelers") filed this action against Aluma Construction Corp., Alberto Vázquez Colón, Hilda Piñeiro Cáceres, Carlos González Torres, Ivette Gómez Díaz, Miguel Bermudez Carmona, Vieques Concrete Mix Corp., Inter-Island Ferry System Corp., Vieques F.O. & G, Inc. (collectively, the "Indemnitors" and/or "Aluma"), and the Puerto Rico Aqueduct and Sewer Authority ("PRASA") to obtain indemnification from Indemnitors and subrogation from PRASA as to surety claims Travelers paid to laborers and materialmen in the rehabilitation and completion of the Marisol, Kennedy, Vegas, and Camaselles Sanitary Sewer System (the "Construction Project") in Toa Baja, Puerto Rico. (Docket No. 33).

Civil No. 18-1795 (GAG)

The Indemnitors answered[1] and counterclaimed against Travelers alleging it failed to sign the closing documents when the Construction Project was completed as well as crossclaims against PRASA of: (1) reimbursement for any damages Indemnitors might pay to Travelers from this suit, (2) monies owed from services rendered, and (3) commercial torts. (Docket No. 85).

Presently before the Court are PRASA's motion for partial summary judgment as to Indemnitors' crossclaim for breach of contract, (Docket No. 354), Indemnitors' motion for summary judgment,[2] (Docket No. 366), and Travelers' motion for summary judgment, (Docket No. 376), as well as motion for judgment on the pleadings as to Indemnitors' counterclaim, (Docket No. 375). Travelers also filed an alternative motion for summary judgment as to Indemnitors' counterclaim. (Docket No. 387). PRASA, Indemnitors, and Travelers all submitted statement of facts, respectively. (Docket Nos. 354-1; 366-1; 376-1).

PRASA moves to strike Indemnitors' statement of facts alleging that it fails to comply with Local Rule 56(e), L. Cv. R. 56(e) (D.P.R. 2020). (Docket No. 381). As such, the Court will first determine whether to strike Indemnitors' statement of facts before propounding upon the factual background of the pending motions for summary judgment.

## I.   Indemnitors, Travelers, and PRASA's Statement of Facts and PRASA's Motion to Strike

### A.   Local Rule 56

A party that moves for summary judgment must show "that there is no genuine dispute as to any material fact" in order to succeed. FED. R. CIV. P. 56(a). Rule 56 requires that the movant support

---

[1] PRASA also answered at Docket No. 148.

[2] Originally, Indemnitors filed their motion for summary judgment at Docket No. 353, but subsequently resubmitted it at Docket No. 366 with leave of Court because Indemnitors failed to substitute the superseded economic report and neglected to amend the motion to include the updated amounts for the damages suffered. (Docket No. 361). Therefore, Indemnitors' filing at Docket No. 353 is hereby found as **MOOT**.

Civil No. 18-1795 (GAG)

the factual assertions allegedly not in dispute with citations "to particular parts of materials in the record[.]" Id. at 56(c)(1)(A). Working together with Rule 56, Local Rule 56(b) requires a movant to include a separate statement of material facts and to support each factual assertion with a citation to the evidentiary record. L. Cv. R. 56(b) (D.P.R. 2020). In addition, Local Rule 56(e) requires that the citation to the record specifically include "the specific page or paragraph of identified record material supporting the assertion." Id. at 56(e); see also Natal Pérez v. Oriental Bank & Tr., 291 F. Supp. 3d 215, 218 (D.P.R. 2018).

PRASA contends that the Indemnitors' statement of facts used exhibits that left out the specific page or paragraph of the identified record material that support a given proposed fact. (Docket No. 381 ¶ 7). PRASA cites to P.R. Am. Ins. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010), Toledo-Colón v. Puerto Rico, 941 F. Supp. 2d 234, 239 (D.P.R. 2013), and Local Rule 56(c) and (e), L. Cv. R. 56 (c), (e) (D.P.R. 2009), to argue that Indemnitors' behavior overlooks the root purpose of the anti-ferret rule. (Docket No. 381 ¶¶ 8-10, 12-13). For example, PRASA indicates that Indemnitors' proposed fact at paragraph 20 does not contain record citation to support it, in violation of Local Rule 56(e). (Docket No. 381 ¶ 14). Thus, PRASA requests the Court to strike Indemnitors' entire statement of facts. (Docket No. 381 at 5).

After considering Indemnitors' opposition, (Docket No. 404), PRASA's reply, (Docket No. 411), Indemnitors' sur-reply, (Docket No. 427), as well as an independent review of all statements of facts, (Docket Nos. 354-1; 366-1; 376-1), the Court finds that Indemnitors' statement of facts appropriately cited to the specific page or paragraph of identified record material supporting their proposed facts. As such, the Court **DENIES** PRASA's motion to strike under Local Rule 56(e) at Docket No. 381. Notwithstanding, if deemed necessary, the Court shall disregard any proposed fact submitted by the parties that is unsupported by record citation to the specific page or paragraph. The

Civil No. 18-1795 (GAG)

United States Court of Appeals for the First Circuit has consistently held that litigants ignore Local Rule 56 at their own peril. See Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). The Court will employ its judicial common sense when interpreting whether the citation provided violates the anti-ferret rule and shall decide accordingly.

## II. **Relevant Factual Background**

### A. Construction Contract

On September 14, 2010, PRASA and Aluma entered into a contract titled "Agreement for the Rehabilitation and Completion of the Marisol, Kennedy, Vegas, and Camaselles Sanitary Sewer System, Sabana Seca Ward, Toa Baja, Puerto Rico" (the "Construction Contract") to build the Construction Project. (Docket Nos. 354-1 ¶ 3; 354-2; 366-1 ¶ 1; 366-2 at 1-9). The owner of the Construction Project is PRASA. (Docket Nos. 33 ¶ 23; 85 ¶ 23; 148 ¶ 12; 376-1 ¶ 19). The Construction Contract constituted the entire integrated contract between PRASA and Aluma. (Docket Nos. 354-1 ¶ 6; 354-2 at 5; 366-2 at 5).

The rights and obligations between PRASA and Aluma arise from the Construction Contract as well as from the supplemental contract documents. (Docket Nos. 354-1 ¶¶ 5, 7; 354-2 at 3; 366-2 at 3). The "General Conditions" is a supplemental contract document in the Construction Contract and considered part of the Construction Contract. (Docket Nos. 354-1 ¶¶ 7-8, 10; 354-2 at 3; 354-3; 366-2 at 3; 380-24). In addition, the Change Orders are supplemental contract documents in the Construction Contract as well as considered a part of the Construction Contract. (Docket Nos. 354-1 ¶¶ 9, 14; 354-2 at 3; 354-6; 354-7; 366-1 ¶ 7; 366-7). "Change Orders" are defined in the General Conditions. (Docket Nos. 354-1 ¶ 11; 354-3 at 1, 2-3; 380-24 at 43, 112-13). The General Conditions also outline what is included as part of the "Cost of the Work" and what is excluded from said definition. (Docket Nos. 354-1 ¶ 12; 354-3 at 4-5, 6-7; 380-24 at 106-09).

Civil No. 18-1795 (GAG)

On June 16, 2014, Aluma sent PRASA a letter submitting a "Modified Total Cost" claim. (Docket Nos. 354-1 ¶ 13; 354-4; 380-25 at 1-10). Two days later, Aluma sent PRASA a letter amending its Modified Total Cost as follows:

- Actual Cost Incurred - $9,100,158.74
- Cost of Equipment used by Aluma - $1,287,062.64
- Home Office Overhead - $975,491.13
- Earnings Not Received by Aluma - $910,017.72
- Cost of Damages to Aluma's Shareholders- $1,000,000.00
- Damages for Aluma closure- $2,400,000.00
- Total Amount Claimed - $8,589,720.58

(Docket Nos. 354-1 ¶ 13; 354-5; 380-25 at 11-13). In Change Order L, the parties executed two (2) separate but substantially identical documents to reflect its content and incorporated the Modified Total Cost into the Construction Contract. (Docket Nos. 354-1 ¶ 15; 354-6; 354-7; 366-7 at 74-76, 78-82). Change Order L states:

> FOURTH: [Aluma] declares that a "Modified Total Cost" (MTC) claim was submitted to CH Caribe/PRASA on June 16, 2014 and amended on June 18, 2014. The alleged claims are regarding loss of productivity, costs for the use of Aluma equipment, site office overhead, [home] office overhead, costs to finance project and interest charged, loss of potential earnings on other projects, costs for closing corporation and cost for damages to Aluma partners, among other conditions as indicated and justified in the MTC.
> FIFTH: [Aluma] reserves its right to pursue the alleged claims as stated in the MTC in the appropriate forum. PRASA reserves its right to raise any and all affirmative defenses based on the merits of the alleged claims in the MTC submitted by [Aluma], and the [c]ontract documents [in the Construction Contract].
> SIXTH: This Written Amendment does not cause, and [Aluma] will not claim, additional economic impact costs to the [Construction] Contract, except for those above mentioned in the [FOURTH clause].

(Docket Nos. 354-1 ¶ 16; 354-6 at 2; 354-7 at 4; 366-7 at 75, 81). However, Aluma's proposed economic damages expert, CPA Armando Suárez, issued a report in which he lists Aluma's claims for damages as follows:

- Direct and Indirect Project Costs (Not Including Own Equipment) - $9,355,181
- Equipment Used - $1,181,031
- Central Office Overhead - $378,009

Civil No. 18-1795 (GAG)

- Percentage of [Aluma] Estimated Profit (12%) - $433,109
- Loss of Interest Income – through 12/31/2020 - $1,530,620
- Insurance (1.2%) - $43,311
- Municipal Taxes and Toa Baja "Patents" (5.5%) - $198,508
- Total Estimated Damage - $5,814,791

(Docket Nos. 354-1 ¶ 17; 354-8; 366-9 at 18).[3]

## B. General Agreement of Indemnity

On October 4, 2012, Vázquez Colón, Piñeiro Cáceres, González Torres, Gómez Díaz, and Bermúdez Carmona subscribed a General Agreement of Indemnity (the "GAI" contract) with Travelers. (Docket Nos. 33 ¶ 18; 85 ¶ 18; 376-1 ¶ 14; 376-3; 388-1 ¶ 14). On December 14, 2012, Aluma, Vieques Concrete Mix Corp., Inter-Island Ferry System Corp., and Vieques F.O. & G, Inc. subscribed the GAI with Travelers. (Docket Nos. 33 ¶ 19; 85 ¶ 19; 376-1 ¶ 15; 376-3; 388-1 ¶ 15). In addition, on this same date, Vázquez Colón, Piñeiro Cáceres, González Torres, Gómez Díaz, and Bermúdez Carmona executed individual affidavits acknowledging their obligation to execute the terms and conditions of the GAI. (Docket Nos. 33 ¶ 19; 85 ¶ 19; 376-1 ¶ 15; 376-3; 388-1 ¶ 15). Indemnitors executed the GAI in exchange for Travelers' issuance of surety bonds on behalf of Indemnitors in connection with one or more construction projects in Puerto Rico. (Docket Nos. 33 ¶ 20; 85 ¶ 20; 376-1 ¶ 16; 376-3; 388-1 ¶ 16).

In furtherance of the GAI, Travelers issued a separate payment and performance bond (the "Bond") to Aluma to secure its performance and fulfillment of the Construction Contract by ensuring payment for labor, materials, and equipment furnished for use in the performance of the Construction Project.[4] (Docket Nos. 33 ¶ 21; 85 ¶ 21; 376-1 ¶ 17; 380-24 at 18-20; 388-1 ¶ 17).

---

[3] PRASA clarifies that it does not accept or admit any of CPA Suárez's conclusions and "stands by the conclusion of its own experts." (Docket No. 354-1 ¶ 17, n. 4).

[4] Travelers asserts that the Construction Project was a bonded project, (Docket Nos. 33 ¶ 21; 376-1 ¶ 17). Contrarily, Indemnitors contest this fact advancing that the GAI was not related to the Construction Project: "[W]hich had been contracted and bonded more than two years earlier and was thought to be close to completion or termination, by the time the GAI was signed. It was rather needed because of the weak situation in which Aluma found itself, because the losses

Civil No. 18-1795 (GAG)

The GAI defines what constitutes a "default" under its terms.[5] (Docket Nos. 376-1 ¶ 21; 376-3 at 1; 388-1 ¶ 21). The GAI also states that the Indemnitors agreed to exonerate, indemnify, and save Travelers harmless from and against all loss and expense of any kind or nature. (Docket Nos. 376-1 ¶ 22; 376-3 at 1; 388-1 ¶ 22). Indemnitors agreed in the GAI to deposit with Travelers an amount as determined by Travelers sufficient to discharge any loss or anticipated loss. (Docket Nos. 376-1 ¶ 28; 376-3 at 2; 388-1 ¶ 28). In accordance with Indemnitors' agreement in the GAI to deposit collateral security, on July 18, 2016, Travelers made a written demand to the Indemnitors for payment of loss, costs, and expenses incurred at that time, which Indemnitors did not pay.[6] (Docket Nos. 33 ¶ 30; 85 ¶ 30; 376-1 ¶¶ 29-30; 376-3 at 2; 376-8; 388-1 ¶¶ 29-30). Travelers' costs and expenses are the result of Travelers paying claims by subcontractors, laborers, and materialmen for work and materials used in the Construction Project.[7] (Docket Nos. 33 ¶ 17; 85 ¶ 17(a); 376-1 ¶¶ 31-33; 388-1 ¶ 31).

---

suffered in the [Construction Project] disqualified Aluma from bidding for subsequent contracts, absent the GAI." (Docket No. 85 ¶ 21). Meanwhile, PRASA admits that it is the owner of the Construction Project, as well as the Colobo Community Water Distribution System, and that the Construction Project falls under the purview of Travelers' Bond. (Docket No. 388-1 ¶ 17). After reviewing the record evidence, the proposed fact stands as proffered because Indemnitors implicitly conceded that the GAI was indeed related to the Construction Project when Indemnitors state that the GAI "was rather needed . . . ." See L. Cv. R. 56(e) (D.P.R. 2020).

[5] PRASA contests this fact arguing that it neither subscribed nor was a party to the GAI and that it is not an Indemnitor. (Docket No. 388-1 ¶ 21). After reviewing the record evidence, this assertion does not dispute the proposed fact and, as such, it is deemed as uncontested. See L. Cv. R. 56(e) (D.P.R. 2020).

[6] Indemnitors object by stating, "[i]t is admitted that a demand was made. The rest is denied." (Docket No. 85 ¶ 30). Notwithstanding, this assertion does not dispute the proposed fact and, as such, it is deemed as uncontested. See L. Cv. R. 56(e) (D.P.R. 2020).

[7] PRASA admits that Travelers paid claims from Aluma's subcontractors and materialmen, (Docket Nos. 388-1 ¶ 31), but denies that the total amount outstanding for payments made by Travelers to Aluma's subcontractors for the Construction Project is $175,199.70 by referencing emails regarding payment of Certification No. 28. (Docket Nos. 388-1 ¶¶ 32-33; 388-7; 376-7 at 2). The Court has reviewed the record evidence, notably the correspondence in question, and rules that PRASA's objections regarding Certification No. 28 are irrelevant to the proffered fact because the payment of Certification No. 28 was not for Travelers' current subrogated Article 1489 claim but rather for other work performed by different laborers and materialmen, notably "Water Works" and "ARO Electrical," at a different construction project, notably the Colobo Community Water Distribution System construction project. See Burke Rozzetti v. Ford Motor Co., 439 F. Supp. 3d 13, 18-19 (D.P.R. 2020) (citing Mitchell v. United States, 141 F.3d 8, 14 (1st Cir. 1998) ("Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

Civil No. 18-1795 (GAG)

### III. <u>Standard of Review</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>see</u> FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" <u>Iverson v. City of Boston</u>, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. <u>Celotex</u>, 477 U.S. at 325. "The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that a genuine issue of material fact remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all reasonable inferences. <u>Id.</u> at 255. Moreover, at the summary judgment stage, the Court does not make credibility

---

it would be without the evidence."); <u>see also</u> FED. R. EVID. 401. The proposed facts are admitted for purposes of summary judgment. <u>See</u> L. CV. R. 56(e) (D.P.R. 2020).

Civil No. 18-1795 (GAG)

determinations or weigh the evidence.  Id.  Summary judgment may be appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation."  Forestier Fradera v. Mun. of Mayagüez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

### IV. PRASA's Motion for Summary Judgment as to Aluma's Third Crossclaim at Docket No. 354

#### A.  Change Order L's Modified Total Cost

PRASA moves for partial summary judgment requesting dismissal of several claims in Aluma's third crossclaim for breach of contract arguing that Aluma waived said claim or, in the alternative, that the same are not covered costs under the supplemental contract documents General Conditions and Change Order L. (Docket No. 354 at 2, 8). Aluma opposed and PRASA replied. (Docket Nos. 380; 399).

PRASA argues that Aluma expressly agreed in Change Order L to "not claim, additional economic impact costs to the [Construction] Contract, except for those above mentioned in the [Modified Total Cost.]" (Docket Nos. 354 at 11; 354-6 at 2; 354-7 at 4). PRASA contends that the Modified Total Cost, (Docket No. 354-5), does not include the claims: (1) Financing of Project and Interests, (2) Insurance, and (3) Municipal Taxes that appear in Aluma's crossclaim, (Docket No. 85 at 31), and its expert's economic damages report, (Docket No. 366-9 at 18). (Docket No. 354 at 11). Thus, PRASA posits that "these three items must be dismissed from the [crossclaim] or stricken from Aluma's expert report." (Docket No. 354 at 11).

In Change Order L, Aluma and PRASA agreed not to claim additional economic impact costs to the Construction Contract other than those mentioned in the Modified Total Cost. (Docket Nos. 354-6 at 2; 354-7 at 4). The Modified Total Cost does include Aluma's claim of (1) Financing of Project and Interests because it was explicitly mentioned in the Modified Total Cost as "Cost of

Civil No. 18-1795 (GAG)

Financing the Project and Related Interest." (Docket No. 354-5 at 2). Change Order L also indicates that the Modified Total Cost is regarding "costs to finance project and interest charged." (Docket Nos. 354-6 at 2; 354-7 at 4; 380-25 at 9). However, the Modified Total Cost does not explicitly include the claims of (2) Insurance and (3) Municipal Taxes. (Docket Nos. 354-5; 354-6 at 2; 354-7 at 4; 380-25 at 9).

Aluma, in opposition to PRASA's motion for summary judgment, argues that the list of claims for damages in the Modified Total Cost is the result of delays in the completion of the project because of PRASA's misrepresentations as well as negligent acts and omissions during the invitation to bid.[8] (Docket No. 380 at 1-2). Aluma states that the list of claims in the Modified Total Cost was open-ended because the Modified Total Cost specifically states that the claim is not limited to those specific items by using the language "which includes, without limitation, the following." Id. at 2, 15. Aluma posits that this clearly indicates that there are additional items related to the claim that were not specifically listed, but which were included in the cost calculations and that Change Order L has similar language, such as "among other conditions as indicated and justified in the [Modified Total Cost]." Id. at 15-16. In addition, Aluma avers that it included (2) Insurance and (3) Municipal Taxes in its initial cost calculations but did not list them separately in the total cost claim. (Docket No. 380 at 16; 380-25 at 9, 12). Aluma also indicates that the cost calculations did not separate most of the items listed in the Modified Total Cost. (Docket No. 380 at 16; 380-25 at 9, 12).

PRASA filed a reply and posits that Change Order L proves PRASA never agreed to have Aluma's list of claims in the Modified Total Cost being open-ended, but instead limited to those that

---

[8] In particular, Aluma claims that PRASA failed to provide the plans and specifications as well as the Construction Contract, and "[s]aid misrepresentations, omissions and/or negligent actions were substantial and created a vice in Aluma's consent (as well as Travelers', whether they allege it or not)." Id. at 1. In addition, Aluma posits that the "inadequate design and insufficient information resulted in 124 different site conditions (DSCs) in a project scheduled for substantial completion in one calendar year." Id. at 2.

Civil No. 18-1795 (GAG)

were properly "indicated and justified" in the Modified Total Cost. (Docket Nos. 399 at 4; 354-6 at 2; 354-7 at 4)). PRASA suggests that the central issue of its motion for summary judgment is whether (1) Financing of Project and Interests, (2) Insurance, and (3) Municipal Taxes were "indicated and justified" in the Modified Total Cost. (Docket No. 399 at 5-6). PRASA argues that since the Modified Total Cost did not indicate and include a claim for (2) Insurance or for (3) Municipal Taxes, Aluma waived the same. Id. at 6.

As to (1) Financing of Project and Interests, PRASA replied that while it is listed as item No. 5 in the Modified Total Cost, the claim is not justified in the Modified Total Cost because Aluma fails to discuss the same in the Construction Contract or even estimate its value. Id. Aluma's crossclaim against PRASA states: "[t]he delays required that Aluma obtain additional financing. Financing costs increased for a cost, estimated at $500,000." (Docket No. 85 at 31). Moreover, PRASA asserts that Aluma's proposed economic damages expert did not compute the cost of financing the Construction Project, which is what Aluma pleaded, but rather the loss of interest income or investment income, which Aluma never pleaded. (Docket Nos. 399 at 6; 380-9 at 26-27)).

B.  Applicable Law

In this diversity case, Commonwealth of Puerto Rico substantive law applies. See Rodríguez-Tirado v. Speedy Bail Bonds, 891 F.3d 38, 41 (1st Cir. 2018); Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009). Under Puerto Rico Law, contracting parties will be bound by their contractual obligations, which must be fulfilled in accordance with the terms of the agreement. P.R. LAWS ANN. tit. 31, § 2994; Mercado–Salinas v. Bart Enterprises Int'l, Ltd., 852 F. Supp. 2d 208, 217 (D.P.R. 2012), on reconsideration in part, 889 F. Supp. 2d 265 (D.P.R. 2012). If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, then the literal terms of the contract will be observed, P.R. LAWS ANN. tit. 31, § 3471, and "a court should not look

Civil No. 18-1795 (GAG)

beyond the literal terms of the contract." Vulcan Tools of P.R. v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st Cir. 1994) (internal quotations omitted); see Mercado-Salinas, 852 F. Supp. 2d at 217. "Under Puerto Rican law, an agreement is clear when it can be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation." Yordán v. Burleigh Point, Ltd., 552 F. Supp. 2d 200, 203 (D.P.R. 2007) (citations omitted) (internal quotation marks omitted). To be clear, the contract has to be "sufficiently lucid to be understood to have one particular meaning . . . ." Piñeiro v. Oriental Grp., Civil No. 07–2068 (DRD), 2014 WL 4729053, at *11–12 (D.P.R. Sept. 22, 2014); Entact Services, LLC v. Rimco, Inc., 526 F. Supp. 2d 213, 221 (D.P.R. 2007).

Moreover, when interpreting a contract, it is critical that the Court read its provisions in relation to one another, giving unclear provisions the meaning that arises from considering all provisions together. P.R. LAWS ANN. tit. 31, § 3475; Piñeiro, 2014 WL 4729053, at *12; Marina Aguila v. Den Caribbean, Inc., 490 F. Supp. 2d 244, 248 (D.P.R. 2007). The contract's "stipulations 'should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of them together.'" Yordán, 552 F. Supp. 2d at 204 (quoting P.R. LAWS ANN. tit. 31, § 3475); Mercado–Salinas, 852 F. Supp. 2d at 217. Further, the Court may determine the meaning of a contract provision on summary judgment if the agreement is clear on its face. Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 111 (1st Cir. 2001); see Torres Vargas v. Santiago Cummings, 149 F.3d 29, 33 (1st Cir. 1998).

The Court disagrees with PRASA's interpretation of the Construction Contract's supplemental documents. The Modified Total Cost's language of "which, includes, without limitation, the following," (Docket No. 380-25 at 9), is clear and shows that the Construction Contract meant to include *additional* items related to the Construction Project such as (2) Insurance and (3) Municipal Taxes that were not specifically listed in the Modified Total Cost but were nevertheless

included in the initial cost calculations. Yordán, 552 F. Supp. 2d at 203. The fact that Aluma's proposed economic damages expert referred to (2) Insurance and (3) Municipal Taxes as separate items, as well as loss of interest and investment income, does not imply that Aluma waived them in the Modified Total Cost by not making the same distinction.

In interpreting Change Order L's language of "as indicated and justified in the [Modified Total Cost]", the Court is not persuaded by Aluma's reading because Change Order L relies on the Modified Total Cost to determine what claims may be pursued. Yordán, 552 F. Supp. 2d at 204 (explaining that contractual provisions must be read in relation to one another). Thus, Change Order L's subsequent inclusion that the claims in the Modified Total Cost must also be "indicated and justified" is irrelevant because of the *broad* language employed in the Modified Total Cost. Moreover, Aluma may recover damages from (1) Financing of Project and Interests because it was *explicitly* referred to as a pursuable claim in the Modified Total Cost. Vulcan Tools of P.R., 23 F.3d at 567 (stating that the Court should not look beyond the literal contractual terms).

C. General Conditions

In addition, PRASA argues that the claims of (4) Extended Office Overhead and (5) Additional Financing/Financing Costs in Aluma's crossclaim, (Docket No. 85 at 31), are expressly excluded from the definition of "Cost of the Work" under Article 10.2.2 of the General Conditions.[9] (Docket Nos. 354 at 11-12; 354-3 at 6-7). As such, PRASA posits that these two claims are not recoverable by Aluma and must be dismissed. (Docket No. 354 at 12).

---

[9] Article 10.2.2 of the General Conditions excludes from the Cost of the Work: (1) Aluma's personnel payroll costs for general administration of the Construction Project in Aluma's principal or branch office other than Aluma's office at the Construction Project, which are considered administrative costs covered by Aluma's fee, (2) expenses of Aluma's principal and branch offices other than Aluma's office at the Construction Project, (3) any part of Aluma's capital expenses, including interest on Aluma's capital employed for the Construction project and charges against Aluma for delinquent payments, (4) costs due to Aluma's negligence, and (5) other overhead or general expense costs of any kind and the costs of any item not specifically included as part of the "Cost of the Work." (Docket No. 354-3 at 6-7).

Civil No. 18-1795 (GAG)

Aluma opposes stating that although PRASA is correct that certain fixed cost overhead items are precluded from being claimed on change orders by Article 10.2.2 of the General Conditions, said section only applies to change orders that do not extend the time of the project. (Docket Nos. 380; 380-24 at 108-09). Instead, Aluma claims that Change Order L falls under Article 10.2.6 of the General Conditions because the Change Orders extended the time of the Construction Project and, as such, Aluma is entitled to all costs caused by construction delays. (Docket No. 380 at 18).

As to this argument, the analysis boils down to deciding which section applies: Article 10.2.2 or Article 10.2.6 of the General Conditions. Article 10.2.6 of the General Conditions specifically states that if a Change Order under Article 10.1.2.3 of the General Conditions "causes a delay in the project completion, the costs of said delays, including project and main office overhead shall be added to the Cost of the Work and a reasonable time extension provided under the [Construction] Contract."[10] (Docket Nos. 380 at 17; 380-24 at 109). Article 10.1.2.3 states that the value of any work covered by a Change Order, where the work involved is neither covered by unit prices contained in the contract documents or by a separate lump-sum agreement, shall be computed on the basis of the Cost of the Work (determined in Article 10.2) plus a Contractor's fee (determined in Article 10.5). (Docket No. 380-24 at 106).

Aluma, in interpreting these articles, argues the following: (1) that the Change Orders did delay the time of the Construction project, (2) that the parties did not agree on a lump sum payment, and (3) that Change Order L was not already covered by the Construction Contract. (Docket No. 380 at 18, 19). Thus, according to Article 10.2.6, Aluma advances that the costs of said delays, including

---

[10] Article 10.1 of the General Conditions deals with "Change of the [Construction] Contract Price." (Docket No. 380-24 at 105). Article 10.1.1 states that the Construction Contract price may only be changed by a Change Order or by a Written Amendments. Id. at 106.

Civil No. 18-1795 (GAG)

project and main office overhead, are added to the "Cost of the Work." (Docket Nos. 380 at 18; 380-24 at 109). PRASA replies that the problem with Aluma's proposition is that Article 10.5 excludes Article 10.2.6 while Article 10.2.2 specifically excludes the main office overhead. (Docket Nos. 399 at 8; 380-24 at 106-111). Article 10.5 details Aluma's fee as the contractor for overhead and profit for work performed under a Change Order. (Docket No. 380-24 at 111). In relevant part, Article 10.5.2.4 states that no contractor's fee shall be payable on the basis of costs itemized under Article 10.1.2.3. (Docket No. 380-24 at 111).

        D.  <u>Applicable Law</u>

      The Court agrees with PRASA's argument that under Article 10.5 of the General Conditions, Aluma's contractor fee shall not be payable on the basis of the costs itemized under Change Order L because it is a Change Order under Article 10.1.2.3. Nevertheless, Aluma may still recover from the claims in Change Order L's Modified Total Cost because said claims are instead computed on the basis of the Cost of the Work established in Article 10.2 in accordance with the *remaining* language of Article 10.1.2.3. <u>Yordán</u>, 552 F. Supp. 2d at 204. The Cost of the Work includes both costs from Aluma's main office as well as the office situated at the Construction Project because Article 10.2.6 of the General Conditions explicitly states that the costs of both "project and main office overhead shall be added to the [C]ost of the [W]ork[.]" (Docket No. 380-24 at 109). Article 10.2.2 of the General Conditions does not apply to Change Order L because the Change Orders caused delays in the project and no agreement as to their price was ever reached, which, as a result, fall under the purview of Article 10.2.6.

      In accordance with the contractual dispositions, Aluma may recover the claims in Change Order L's Modified Total Cost based on Aluma's Cost of the Work pursuant to Article 10.2.6. Thus, the Court holds that Aluma's claim of "(4) Extended Office Overhead" may proceed to include the

Civil No. 18-1795 (GAG)

costs from Aluma's main office as well as the Construction Project office. Moreover, since Aluma may recover damages from "(1) Financing of Project and Interests" because it was explicitly referred to as a pursuable claim in the Modified Total Cost, the Court finds that Aluma may also recover its claim for "(5) Additional Financing/Financing Costs." See Vulcan Tools of P.R., 23 F.3d at 567.

    E.  Conclusion

For the foregoing reasons, the Court **DENIES** PRASA's motion for partial summary judgment at Docket No. 354.

**V.**  **Aluma's Motion for Summary Judgment as to its Third Crossclaim for Breach of Contract and Dolo at Docket No. 366**

Aluma moves for summary judgment against PRASA requesting $10,327,201.00 in damages due to its losses resulting from PRASA's breach of contract, failure to perform its obligations, and commercial torts. (Docket No. 366). Similar to its crossclaim, (Docket No. 85 at 20-21), Aluma advances that PRASA allegedly incurred in multiple induced misrepresentations and occultation of essential facts, amounting to contractual "dolo" under Puerto Rico law, regarding the repair and completion of the Construction Project. (Docket No. 366 at 1-2). Aluma contends that PRASA behaved negligently and/or fraudulently in instances such as: the invitation to bid, the development of plans and specifications for the project, and the drafting of the supplemental contract documents. (Docket No. 366 at 1, 25). PRASA opposed and Aluma replied. (Docket Nos. 382; 398).

First, Aluma argues that summary judgment should be awarded in its favor as a result of PRASA's actual fraud in misinforming bidders to the Construction Project of the site conditions and as to the true nature of the work they would have to perform. (Docket No. 366 at 18). Second, Aluma avers that PRASA breached the Construction Contract by acting in bad faith before, throughout the duration of, and after the project ended, even when Aluma complied with its obligations. Id. These alleged fraudulent actions or breaches of contract consist of PRASA: (1) misinforming bidders,

Civil No. 18-1795 (GAG)

including Aluma, when it told the bidders that the sewage system that they were going to repair was not in use, while the sewage system was in continuous use, Id.; (2) failing to inform the bidders about the true conditions of the soil as well as broken pipes in the system, Id. at 19; (3) failing to inform Aluma that the ultimate connection of the sanitary system was a treatment plant in the municipality of Bayamón, which did not have the capacity to handle the new flows, (Docket No. 366 at 19), and (4) failing to properly collect on site data and consider the true conditions on the ground and include them in the plans and documents of the Construction Contract. Id.

In short and put simply, Aluma argues that it was not warned that it was walking into an "ecological and sanitary disaster" caused by PRASA's lack of adequate fact finding on the site, improper design, improper supervision of prior contractors as well as of its own employees, and of the entrepreneurial neighbors who connected all kind of piping into the sanitary system. Id. Hence, Aluma posits that the substantial cost overruns and delays that took place were all caused by PRASA's misrepresentation of the septic conditions on site, which resulted in over one hundred different site conditions. Id. at 21.

PRASA, in opposition to Aluma's motion for summary judgment, argues that the same should be denied because a trier of fact is needed to consider and allocate the alleged liability between PRASA as well as Entech Design, the project designer, and CH Caribe, the project administrator. (Docket No. 382 at 4-9). PRASA argues that the alleged negligent acts of multiple tortfeasors caused its damages, but since Aluma never interrupted the statute of limitations against Entech Design and CH Caribe, these tortfeasors have been released from all liability. (Docket Nos. 333; 382 at 4). PRASA indicates, relying on Szendrey v. Hospicare, Inc., 158 P.R. Dec. 648, 658-59, P.R. Offic. Trans. (P.R. 2003), that such release benefits PRASA because it eliminates joint liability, meaning PRASA can no longer be required to pay damages caused by Entech Design and CH Caribe. Id.

PRASA, relying on <u>Sagardía de Jesus v. Hosp. Aux. Mutuo</u>, 177 P.R. Dec. 484, 499-500, P.R. Offic. Trans. (P.R. 2009), advances that the trier of fact needs to review all admissible evidence in order to conclude if Aluma suffered any damages caused by any tortfeasor and, if so, allocate liability among as well as determine the amount of damages it can recover. (Docket No. 382 at 4). Aluma emphasizes that such apportionment can only be made by the jury after trial. <u>Id.</u>

Aluma replies to said opposition explaining that under Article 10.2.6 and Article 9 of the General Conditions, Aluma has the right to compensation for any and all costs caused by delays attributable to PRASA and its agents that Change Order L addressed.[11] (Docket Nos. 380 at 17; 380-24 at 109; 398 at 5-8). Aluma argues that CH Caribe and Entech Design are PRASA's agents under the Construction Contract. (Docket No. 398 at 7). Therefore, if CH Caribe and Entech Design bear any, or all, of the responsibility for the delays which caused Aluma's additional costs and damages, PRASA is still responsible to Aluma for those costs pursuant to the Construction Contract and its General Conditions. <u>Id.</u> Aluma concludes that there is no controversy of fact to be tried related to CH Caribe's or Entech Design's liability because Aluma is wholly liable for all costs and damages under the Construction Contract and its General Conditions, including the percentage of damages caused by CH Caribe and Entech Design. <u>Id.</u>

As a threshold matter, the Court notes that Aluma's motion for summary judgment contains underdeveloped and flawed legal arguments that misconstrue the applicable jurisprudence. As a result, this poorly carried out motion for summary judgment misleads PRASA's opposition by unnecessarily delving into irrelevant caselaw, confusing tort negligence with contractual negligence, (Docket No. 382). Moreover, Aluma's reply advances a novel legal theory not briefed in its

---

[11] Article 10.2.6 states that if a change order extends the time of completion and no agreement as to the price is reached such as Change Order L, "the costs of said delays, including project and main office overhead, shall be added to the Cost of the Work . . ." (Docket No. 380-24 at 109).

Civil No. 18-1795 (GAG)

crossclaim against PRASA nor its motion for summary judgment. (Docket No. 398). The problem for the parties is that "[j]udges are not mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly[.]" Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 139 (1st Cir. 2017) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)). This includes "highlighting the relevant facts and analyzing on-point authority." Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (citation omitted). Notwithstanding these deficiencies, the Court shall attempt to clarify the parties' arguments, which will serve as a roadmap for trial in this case. In the end, a jury trial is warranted because, at this stage of the proceedings, Aluma has failed to meet its burden of proof for its contractual dolo claim in order to obtain judgment in its favor.

A.  Applicable Law

The Puerto Rico Supreme Court has held that "when the breach of a contractual obligation causes harm to any of the contracting parties, an action for damages for breach of contract lies." Redondo Const., Co. v. Izquierdo, 929 F. Supp. 2d 1, 12 (D.P.R. 2012) (citing Soc. de Gananciales v. Velez & Asoc., 145 P.R. Dec. 508, P.R. Offic. Trans. (P.R. 1998)). This cause of action arises from Article 1054 of the Puerto Rico Civil Code, which states that: "[t]hose who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." P.R. LAWS ANN. tit. 31, § 3018.

In the case of Muñiz-Olivari v. Stiefel Labs, 174 P.R. Dec. 813 (P.R. 2008),[12] the Court explained that "[w]hile an action for extracontractual [or tort] damages under Article 1908 protects

---

[12] The Muñiz-Olivari v. Stiefel Labs, 174 P.R. Dec. 813 (P.R. 2008), decision was the result of an interjurisdictional certification from the U.S. District Court for the District of Puerto Rico as ordered by the First Circuit. Muñiz-Olivari v. Stiefel Laboratories, Inc., 441 Fed. Appx. 4, 5 (1st Cir. 2011) (unpublished). The certified translation of this Puerto Rico Supreme Court's opinion was filed before the district court docket for said case. See Muñiz-Olivari v. Stiefel Labs., Inc., Civil No. 03-2076 (JP), Docket No. 126, 2010 WL 891325 (D.P.R. Mar. 8, 2010). The Court has relied on said translation.

Civil No. 18-1795 (GAG)

the general duty of necessary diligence for social coexistence, an *ex contractu* action is based on the breach of a duty arising from a previous agreement of wills between the parties." Id. at 818. The Court further discussed that both tort and *ex contractu* actions "share their essential elements" because in *ex contractu* actions "the movant must prove the existence of the damages alleged and of the negligent or fraudulent breach of contractual obligation" on top demonstrating the "cause and effect relationship between the breach and the ensuing damages." Id. at 819. Similarly, relevant to the case at hand, in Muñiz-Olivari, the Court reiterated that "*ex contractu* actions can only be brought by one contracting party against the other" because in order to regain losses and damages resulting from a breach of contract there must be a prior contractual relationship between the litigating parties. Id. at 822; see also Montes-Santiago v. State Ins. Fund Corp., Civil No. 07-1717 (SEC), 2010 WL 1254829, at *1 (D.P.R. Mar. 25, 2010) (discussing that "under Puerto Rico law a third party foreign to a contractual relationship does not have standing under Article 1054 of the Civil Code"). Notwithstanding, nothing prevents a "third party, who is an outsider in the contractual relationship from which the damages claim arises from claiming compensation for his own damages pursuant to Article 1802." Muñiz-Olivari, 174 P.R. Dec. at 823.

Now, under Puerto Rico law, "fraud that affects a contracting party is commonly referred to as "dolo" or deceit." Rivera v. Marriott Int'l, Inc., 456 F. Supp. 3d 330, 341 (D.P.R. 2020). The Civil Code establishes that an agreement may be null when the consent of a party is given based on the deceit of another. Burk v. Paulen, 100 F. Supp. 3d 126, 134 (D.P.R. 2015); see P.R. LAWS ANN. tit. 31, § 3404. "Such deceit occurs 'when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made.'" Burk, 100 F. Supp. 3d at 134; P.R. LAWS ANN. tit. 31, § 3408. At the same time, dolo is "'substantial' ('grave'), when it determines the consent of a party, or 'incidental' when it merely

Civil No. 18-1795 (GAG)

influences the consent." Burk, 100 F. Supp. 3d at 134; P.R. Laws Ann. tit. 31, § 3409; P.C.M.E. Commercial, S.E. v. Pace Membership Warehouse, Inc., 952 F. Supp. 84, 92 (D.P.R. 1997).

A dolo claim "can take two forms: (1) dolo in the formation of contracts, and (2) dolo in the performance of contractual obligations." Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 62 (1st Cir. 2011). Contractual dolo in the formation of a contract "is essentially fraud in the inducement, which exists when a party is induced by false statements to execute a contract which he otherwise would not have made." Id. at 62 (modifications, internal quotations marks, and citations omitted). A party alleging said fraud must demonstrate: "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud." P.R. Elec Power Auth. v. Action Refund, 515 F.3d 57, 66 (1st Cir. 2008) (citing P.R. Laws Ann. tit. 31, § 3408). On the other hand, "dolo" can be manifested in the "performance" of a contractual obligation where a party, knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation. See Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp., 92 F. Supp. 2d 8, 18 (D.P.R. 2000). Contractual dolo arising during the performance of the contract does not result in the nullification of the contract; instead, "Article 1060 of the Civil Code establishes that the party who engages in dolo is liable for all damages 'which clearly may originate from the nonfulfillment of the obligation.'" Puerto Rico Tel. Co. v. SprintCom, Inc., 662 F.3d 74, 99 (1st Cir. 2011) (quoting P.R. Laws Ann. tit. 31, § 3024). Such damages are "broader than those stemming from a good faith breach of contract, where, in contrast, damages are limited to 'those foreseen or which may have been foreseen, at the time of constituting the obligation, and which may be a necessary consequence of its nonfulfillment.'" Id. (quoting P.R. Laws Ann. tit. 31, § 3024). "Notably, the Puerto Rico Supreme Court has stated that

Civil No. 18-1795 (GAG)

dolo 'in the performance of obligations is equalized to bad faith.'" Id. (quoting Canales v. Pan Am., 12 P.R. Offic. Trans. 411, 112 P.R. Dec. 329, 340 (P.R. 1982)).

Whatever the case, "dolo", like fraud, "is not presumed, and the party alleging dolo bears the burden of proof." Burk, 100 F. Supp. 3d at 134. "In order to prove dolo[, the party] would have to demonstrate the intentional fault or bad faith of the person to whom it is imputed, given that good faith is presumed." Pace Membership Warehouse, Inc., 952 F. Supp. at 92; see also Feliciano-Munoz v. Rebarber-Ocasio, 970 F.3d 53, 63 (1st Cir. 2020).

B.  Discussion

Bearing this in mind, the Court finds it necessary to first untangle Aluma's legal theory. In its crossclaim against PRASA (Docket No. 85), Aluma characterizes its cause of action as a "commercial tort" caused by PRASA's "gross negligence", "actual fraud", "malicious misrepresentations", and "occultation" of the Construction Project's site conditions and agreed upon in the Construction Contract, as modified through change orders and/or supplemental contract documents. (Docket No. 85 at 23-31). Otherwise explained, "[t]he delays and the losses suffered by Aluma are direct and indirect result of PRASA's misrepresent[ation] to Aluma[.]" Id. at 27. When moving for summary judgment, Aluma argues a claim for breach of contract, specifically for contractual dolo, an alternative claim requesting the specific performance of the contractual obligation, and an all-encompassing claim for "commercial tort." The Court notes that, in its arguments in support of summary judgment, Aluma fails to include any specific reference as to which contractual obligations or clauses were breached by PRASA. (Docket No. 366). Throughout the motion, Aluma consistently relies on boilerplate language used to define both modalities of contractual dolo. Id. at 14-18. As such, the Court will not entertain its alternative "specific performance" claim and holds its general

Civil No. 18-1795 (GAG)

"commercial tort" claim does not cite on-point authority. Hence, the only claim left to consider is that of contractual dolo.

Notwithstanding, in its reply, Aluma alters its legal theory and states that "[t]hough we have claimed, and demonstrated, gross negligence and/or scienter, we do that for the *additional* remedies that can be granted. Aluma's claim, at its core, is simple and based on the Contract." (Docket No. 398 at 2). Aluma invokes Articles 9.3.1.2, 9.3.1.2.1, 9.3.1.4, 9.3.1.4.1, 9.4.2, and 10.2.6 of the General Conditions to attempt to establish that under said clauses PRASA is contractually responsible to compensate Aluma for any delays in carrying out the project. Id. at 2-3. Aluma further avers that, according to these Articles, "fault" as to who caused the delays is not required by either party. Id. at 4, 6.

The Court will also not entertain any legal argument presented in Aluma's reply. This ruling is not as to the merits, if any, of said claims. The Court cannot permit that, after having plead only contractual dolo since the filing of its crossclaim, Aluma now posit that those were simply "additional remedies" as to its general breach of contract claim. The Court disavows Aluma's "attempt[] to eat [its] cake and have it, too." State St. Bank & Tr. Co. v. United States, 313 F.2d 29, 31 (1st Cir. 1963). Moreover, "[a]rguments, unrelated to the opposing brief, that are brought for the first time in a reply brief are belated, deemed waived, and will not be considered." García-Fernández v. Global Capital Markets, Inc., Civil No. 08-2309 (ADC), 2010 WL 11545619, at *3 (D.P.R. Mar. 22, 2010); see also Grigous v. Gónzales, 460 F.3d 156, 163 (1st Cir. 2006) ("An argument not seriously developed in the opening brief" is waived); Southwire Co. v. Ramallo Bros. Printing, Inc., 540 F. Supp. 2d 307, 312 n. 5 (D.P.R. 2008) ("To the extent that [defendants] address the issue in its reply, it does so too late.").

Civil No. 18-1795 (GAG)

In addition, the Court holds that Aluma's claims against PRASA can only be read as being *ex contractu* in nature and not extracontractual. This implies that Article 1054 of the Puerto Rico Civil Code, and not Article 1802, must apply to this case. Hence, if any negligence in contracting was established, the same must be limited to the contracting parties: Aluma and PRASA. As a matter of law, the Court also holds that Entech Design and CH Caribe, which the parties dispute may or may not have caused damages as joint tortfeasors, are excluded from the legal analysis as to the present motion for summary judgment. As such, the normative cases of Szendrey v. Hospicare, Inc., 158 P.R. Dec. 648, P.R. Offic. Trans. (P.R. 2003), and Sagardía de Jesus v. Hosp. Aux. Mutuo, 177 P.R. Dec. 484, P.R. Offic. Trans. (P.R. 2009) are inapplicable to Aluma's contractual dolo claims.

Finally, now turning to Aluma's contractual dolo claim, the Court reads both the crossclaim and motion for summary judgment as arguing that PRASA incurred: (1) dolo in the formation of contracts and (2) dolo in the performance of contractual obligations. Portugues-Santana, 657 F.3d at 62. Aluma's main proposition is that PRASA breach its contractual obligations by incurring in contractual dolo during the contract's bidding process, the development of the plans and specifications for the project, and the drafting of the supplemental contract documents. (Docket No. 366 at 18). Aluma specifically advances that PRASA misinformed bidders to the Construction Project of the site conditions and as to the true nature of the work they would have to perform and that it acted in bad faith before, throughout the duration of, and after the project ended, even when Aluma complied with their obligations. Id.

For purposes of entertaining the present summary judgment, the Court shall limit its analysis to Aluma's argument that PRASA misinformed bidders about numerous aspects of the Construction Project. Notwithstanding, the following reasoning equally applies to Aluma's claims that PRASA acted in bad faith when developing the plans and specifications for the project and the drafting of

Civil No. 18-1795 (GAG)

the supplemental contract documents. In the end, Aluma relies on the same record evidence that the Court now deems insufficient to establish its contractual dolo claim.

To support its argument that PRASA *misinformed* bidders about two previous contractors' attempts to complete the sanitary system; the malfunctioning, non-apparent, sceptic site conditions of the piping and soil; whether the sanitary pipes were actually in use or not; and about the illegal connections to the pipe system, (Docket No. 366-1 ¶¶ 25-29; 35; 42-43), Aluma relies on the following record evidence: (1) Exhibit A – Project Contract - Minutes (Docket No. 366-2); (2) Exhibit B - Petition of Change Orders A to L (Docket No. 366-3); (3) Exhibit F – Change Orders (Docket No. 366-7); (4) Exhibit G – Expert Report Engineer Rafael Jiménez Pérez (Docket No. 366-8); (5) Exhibit J – Carlos González Statement Under Penalty of Perjury (Docket No. 366-11); (6) Exhibit K – Change Order E PMC-1-71-5003 (Power Point) (Docket No. 366-12; (7) Exhibit L – Descriptive Memoir by PRASA (Docket No. 366-13); (8) Exhibit M – Borings Locations (Docket No. 366-14; (9) Exhibit P – Letter to Engineer Ismael Santiago Colón, Project Manager CH Caribe, Mar. 21, 2011 (Docket No. 366-17), and (10) Exhibit Q – History of Septic Condition. (Docket No. 366-18).

Aluma advances that said record evidence not only supports its factual allegations but serves to establish its burden of proof as to all the elements of its contractual dolo claim. The Court disagrees and finds, after reviewing these exhibits, that Aluma's proposed uncontested facts are unsupported by evidence and, as such, cannot establish at the summary judgment stage that PRASA incurred in contractual dolo. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (noting that under Rule 56, "the court should review the record as a whole"). As previously discussed, dolo "is not presumed, and the party alleging dolo bears the burden of proof." Burk, 100 F. Supp. 3d at 134. When evaluating a motion for summary judgment:

Civil No. 18-1795 (GAG)

> [I]f the movant bears the burden of proof on a claim at trial, then its burden of production is *greater*. It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating *why the record is so one-sided* as to rule out the prospect of the nonmovant prevailing. If the movant fails to make that initial showing, the court must *deny* the motion, even if the opposing party has not introduced contradictory evidence in response.

Wright & Miller, Grounds for Summary Judgment—Burden on the Moving Party, Federal Practice and Procedure § 2727.1 (4th ed. 2017) (emphasis added). To prove contractual dolo, Aluma would need to demonstrate, *with supporting evidence*, that PRASA incurred in *intentional* fault or bad faith, provided that good faith is always presumed. See Pace Membership Warehouse, Inc., 952 F. Supp. at 92; see also Citibank Glob. Markets, Inc., 573 F.3d at 29.

Most of the proposed facts referenced above, (Dockets No. 366-1 ¶¶ 25; 26; 27; 29; 35; 43) rely on "Exhibit J – Carlos González Statement Under Penalty of Perjury", (Docket No. 366-11), a *post-discovery*, *self-serving* sworn statement, which was not produced during discovery. Therefore, the non-movant parties did not have the benefit of examining it and questioning him about it during his deposition. Mr. González, one of the owners of Aluma, was deposed via Zoom on September 9, 2020, and Exhibit J (his sworn statement) is dated December 11, 2020—the same date that Aluma filed its original motion for summary judgment. (Docket Nos. 353; 366-11).

Rule 56 of the Federal Rules of Civil Procedure require that affidavits or declarations "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Given that affidavits are *ex parte* documents, when offered on a summary judgment motion "are scrutinized carefully by the court to evaluate their *probative value*" and to determine whether they meet the standards set forth in FED. R. CIV. P. 56(c)(4). Wright & Miller, Materials Considered on the Motion-Pleadings, Depositions, Interrogatory Answers, Admissions, Affidavits, Stipulations and Electronically Stored Information, Federal Practice and

Procedure § 2722 (4th ed. 2017). "Following discovery, a party may not use a later affidavit to contradict facts previously provided to survive summary judgment, unless the party provides a satisfactory explanation for providing post summary judgment affidavit." Reyes v. Pro. HEPA Certificate Corp., 74 F. Supp. 3d 489, 491 (D.P.R. 2015), aff'd sub nom. Escribano-Reyes v. Pro. Hepa Certificate Corp., 817 F.3d 380 (1st Cir. 2016); see also Morales v. AC Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001). The suspect timing of an affidavit, "raises serious concerns as to [its] validity and authenticity." Vargas v. Laguer, Civil No. 14-1597 (CVR), 2017 WL 1230303, at *3 (D.P.R. 2017); see also Pérez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001). More so, "rather than basing the validity of an affidavit upon how self-serving the statements are to the affiant, courts require statements contained in affidavits to be factually specific and supported by the record." Malavé-Torres v. Cusido, 919 F. Supp. 2d 198, 204 (D.P.R. 2013).

The present sworn statement incorporates by references various of Aluma's proposed statement of facts and affirms in a conclusory fashion that "all that is stated [in the Statement of Fact] is true and correct." (Docket No. 366-11 at 3). Mr. González further states—after relying on the statement of facts its affidavit is *supposed* to support—that PRASA incurred in "misrepresentations and occultation of the [site's] true conditions" Id. This sworn statement is impermissibly self-serving and misconstrues the purpose of a sworn statement under FED. R. CIV. P. 56(c)(4). It has it backwards because the statement must be "be factually specific and supported by the record," not the other way around (*i.e.* having the statement of facts support the affidavit). Malavé-Torres, 919 F. Supp. 2d at 204. As such, the Court shall disregard Mr. González's statement under penalty of perjury because allowing it would hamper the "procedural integrity of a summary judgment" process. Calderón Amézquita v. Rivera-Cruz, 483 F. Supp. 3d 89, 111 (D.P.R. 2020) (citing Mahan v. Bos. Water & Sewer Comm'n, 179 F.R.D. 49, 53 (D. Mass. 1998)).

**Civil No. 18-1795 (GAG)**

As to the other evidence submitted to the record by Aluma—such as the bidding minutes, descriptive memoirs, change orders, and letters—none help to establish that PRASA misinformed bidders with an *intent* to defraud them. See Exhibit A – Project Contract – Minutes, (Docket No. 366-2); Exhibit B - Petition of Change Orders A to L, (Docket No. 366-3); Exhibit F – Change Orders, (Docket No. 366-7); Exhibit K – Change Order E PMC-1-71-5003 (Power Point), (Docket No. 366-12); Exhibit L – Descriptive Memoir by PRASA, (Docket No. 366-13); Exhibit P – Letter to Engineer Ismael Santiago Colón, Project Manager CH Caribe, Mar. 21, 2011, (Docket No. 366-17); Exhibit Q – History of Septic Condition, (Docket No. 366-18). From these documents it may be reasonably inferred to that, to finish the project, all parties approved postpositions and alterations to the Construction Project, in spite of the site conditions and whom or what caused the same because Aluma was neither renouncing to its rights nor claims. (See e.g., Docket No. 366-7). R.G. Fin. Corp., 446 F.3d at 182 (noting that all reasonable inferences at the summary judgment stage are made in the nonmovant's favor). These exhibits may indeed support that the site conditions encountered by Aluma were drastically different to those originally proffered by PRASA during the bidding process. However, Aluma has failed to make an affirmative initial showing as to how the evidence *ties together* and amounts to PRASA's intentional fault, bad faith, or intent to defraud. See Action Refund, 515 F.3d at 66.

Finally, as to Aluma's reliance on its expert report, Exhibit G – Expert Report Engineer Rafael Jiménez Pérez, (Docket No. 366-8), to show support for a contractual dolo claim, the Court finds that PRASA has sufficiently shown through its own expert Engineer Javier Rodriguez Mejias, (Docket No. 382-4), that contested opinions exist as to whether PRASA's action or inactions constitute induced misrepresentations or occultations of essential information. The evaluation of these experts' opinion should be left to a jury to evaluate. See Ruiz-Troche v. Pepsi Cola of Puerto

Civil No. 18-1795 (GAG)

Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998) ("As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.") (internal quotation marks and citations omitted)

Consequently, Aluma did not distinctively cite facts that satisfied the elements for contractual dolo nor "demonstrat[ed] *why the record is so one-sided* as to rule out the prospect of [PRASA] prevailing." Wright & Miller, Grounds for Summary Judgment—Burden on the Moving Party, Federal Practice and Procedure § 2727 (4th ed. 2017) (emphasis added). As such, Aluma fails to show that PRASA knowingly and intentionally, through deceitful means, avoided complying with its contractual obligations. See Generadora de Electricidad Del Caribe, 92 F. Supp. 2d at 18.

C.  Conclusion

The Court, hence, **DENIES** Aluma's motion for summary judgment at Docket No. 366.

VI. **Travelers' Motion for Summary Judgment Against Indemnitors and PRASA at Docket No. 376**

Travelers moves for summary judgment arguing that, as it pertains to the Construction Project, it has incurred in losses, expenses, and costs attributable to Indemnitors and PRASA that amount to $227,024.28 fulfilling its obligations under the Bond. [13] (Docket No. 376 at 2; 14). Travelers brings these claims under Article 1489 of the Puerto Rico Civil Code, P.R. LAWS ANN. tit. 31, § 4130, and further avers breach of contract under Puerto Rico law. (Docket No. 418 at 5). Travelers posits that Indemnitors breached the collateralization provision of the GAI, where Indemnitors agreed "to deposit with [Travelers], on demand, an amount as determined by [Travelers] sufficient to discharge

---

[13] Travelers also requests $175,199.70 plus attorney's fees, costs, and interest from Indemnitors and PRASA. (Docket No. 376 at 14).

any Loss or anticipated Loss." (Docket Nos. 376 at 5; 376-3 at 2). On July 18, 2016, Travelers made a written demand to Indemnitors for payment of loss, costs and expenses incurred at that time and, according to Bond Claim Executive Tim Snyder, Indemnitors did not deposit with Travelers the amount requested. (Docket Nos. 376 at 5; 376-2 ¶ 12; 376-8). Thus, Travelers argues that when Indemnitors failed to deposit with Travelers, on demand, the amount requested sufficient to discharge Travelers' current and anticipated losses, Indemnitors breached the collateralization provision of the GAI, which constitutes a default of the GAI under its definition of default: "(c) a breach of any provision of this Agreement." (Docket Nos. 376 at 6; 376-3 at 1).

Travelers further argues that Indemnitors defaulted under subsection (d) of the GAI's definition of default when they failed "to make payment of a properly due and owing bill in connection with any Contract." (Docket Nos. 376 at 6; 376-3 at 1). Travelers alleges that Tim Snyder's statement under penalty of perjury establishes that $175,199.70 of the total amount Travelers paid and Indemnitors currently owe is for claims that were properly due and owing from Aluma subcontractors, workers, materialmen, and others in the Construction Project. (Docket Nos. 376 at 6; 376-2 ¶ 15). Travelers concludes that as established in the GAI, "failure to make payment of a properly due and owing bill in connection with any Contract" constitutes a default under the GAI—regardless of whether PRASA is responsible for Aluma's inability to make payment. (Docket Nos. 376 at 6-7; 376-3 at 1).

Moreover, according to Tim Snyder's statement under penalty of perjury, Travelers also maintains that it has also paid an additional $51,824.58:

> [I]n the following Bond-related endeavors: (a) investigating the claims made against the Bond by Aluma's subcontractors, workers, materialmen and others in the [Construction Project], (b) prosecuting and defending the present action, (c) obtaining releases from Aluma's subcontractors, workers, materialmen and others in the [Construction Project] to which Travelers paid under the Bond, (d) paying the claims made against the Bond by Aluma's subcontractors, workers, materialmen and

Civil No. 18-1795 (GAG)

others in the [Construction Project] and (e) enforcing by litigation or otherwise the provisions of the GAI, such as attempting to collect payment from Indemnitors before this suit was filed.

(Docket Nos. 376 at 7; 376-2 ¶ 16). In sum, Travelers asserts that it has paid a net amount of $227,024.28 under the Bond. (Docket Nos. 376 at 7; 376-2 ¶ 17).

Travelers advances that Indemnitors conceded in their answer that its costs and expenses "are the result of it having paid[] claims by subcontractors, workers and equipment and material suppliers, for work and materials used in [the Construction Project]." (Docket Nos. 85 ¶ 17(a); 376 at 7). Therefore, Travelers posits it is an uncontested fact that the monies claimed by Travelers result from costs and expenses fulfilling Travelers' obligations under the Bond. (Docket No. 376 at 7-8).

The Court notes that PRASA's opposition to Travelers' motion for summary judgment contains multiple and alternative arguments. For purposes of clarity, the parties' arguments shall be entertained accordingly and displayed in different subsections. Provided that federal courts have a particular "responsibility to police the border of federal jurisdiction" because "the Constitution limits the jurisdiction of federal courts," the Court shall foremost entertain the subject-matter jurisdiction issues raised. Spielman v. Genzyme Corp., 251 F.3d 1, 4 (1st Cir. 2001); see also U.S. Const. Art. III. Subsequently, the Court shall address PRASA's array of legal arguments and then evaluate Traveler's claim on the merits.

A. Subject-Matter Jurisdiction

i. Incorporated Forum-Selection Clause

PRASA contends that the Court lacks subject-matter jurisdiction because the forum-selection clause in PRASA's Construction Contract is binding on Travelers. (Docket Nos. 388 at 10; 43-1 at 1). PRASA argues that Travelers incorporated the Construction Contract into the Bond and one of the conditions of the Construction Contract is that the parties agreed to a forum-selection clause that

Civil No. 18-1795 (GAG)

established that any controversies arising in connection to the Construction Project shall be submitted to the Puerto Rico Court of First Instance, San Juan. (Docket No. 388 at 23). PRASA argues that since the Bond used unintelligible language, the terms of the Construction Contract are subsequently incorporated into the Bond. Id. at 10.

Travelers replies that the Puerto Rico Supreme Court has decided the issue of whether the terms in a separate contract are dispositive when that contract is incorporated into a Bond. See Mun. of San Juan v. Stadium & Coliseum Operators, Inc., 13 P.R. Offic. Trans. 628, 632-33, 113 P.R. Dec. 490, 493-94 (P.R. 1982). In Mun. of San Juan, the Puerto Rico Supreme Court held that the "trial court's reasoning that the bond covers the other items because the contract was incorporated thereinto is not a determining factor in a case[.]" 13 P.R. Offic. Trans. at 632. The Puerto Rico Supreme Court concluded that the bond unequivocally stated in clear, express, and restrictive language, that the liability was limited according to the terms of the bond. Id. Moreover, Travelers suggests that this Court reached the same conclusion in Intimate Fashion, Inc. v. El Telar, Inc., Civil No. 06-1204 (CVR), 2008 WL 11495182 (D.P.R. Mar. 3, 2008), adopted by, 570 F. Supp. 2d 225, 232 (D.P.R. 2008). In Intimate Fashion, the Court held that "the surety's liability toward the obligee comes from the text of the bond, not from the contract between the principal and the obligee." 2008 WL 11495182 at *17 (citing Mun. of San Juan, 13 P.R. Offic. Trans. at 632).

Consequently, Travelers argues that the Bond has clear, express, and restrictive language detailing what Travelers' responsibilities will be under the Bond, who is entitled to claim under the Bond, the time limitations for claiming under the Bond, and the contract that it is bonding. (Docket No. 418 at 4). Travelers further indicates that there is absolutely no language that may suggest that Travelers is assuming any of Aluma's duties and obligations under the Construction Contract other

Civil No. 18-1795 (GAG)

than those specifically described in pages 2 and 3 of the Bond. (Docket Nos. 418 at 4; 43-1 at 2-3; 380-24 at 18-20). Thus, Travelers argues that the Court has jurisdiction to entertain this case.

The Court agrees with Travelers. The forum-selection clause in the Construction Contract that was allegedly incorporated into the Bond is not a determining factor as a matter of law according to the precedent established in <u>Mun. of San Juan</u>, 13 P.R. Offic. Trans. at 632-33.  PRASA's argument fails because the Bond does not impede the Court from presiding over this action. (Docket Nos. 43-1 at 2-3; 376-3 at 3).

*ii.   Political Code's Venue-of-Action Statute*

In the alternative, PRASA argues the Court lacks subject-matter jurisdiction because, in accordance with the Puerto Rico Political Code, when Travelers issued the Bond for the Construction Project, it agreed that any controversy that arises in connection with the Construction Project has to be litigated in local courts. (Docket No. 388 at 9). According to P.R. LAWS ANN. tit. 22, § 47, "[e]very contractor who is awarded a contract for the construction[] of any public work, shall post a payment bond in behalf of the Commonwealth of Puerto Rico, which shall be obligatory and effective on and after the date on which the contract is executed." As such, the Political Code states, "[e]very action under §§ 47-58 of this title shall be instituted in the name of the interested party or parties in the part of the Court of First Instance within which the work is located or in which the complainant, or, if more than one, any of them, resides." P.R. LAWS ANN. tit. 22, § 56. Thus, PRASA argues that the Court cannot contravene the will of the Commonwealth legislature, who clearly state that any controversy in connection with a public work contract be litigated in the local courts where the project is located and not before this Court. (Docket No. 388 at 10).

Federal courts sitting in diversity apply state substantive law and federal procedural law. <u>Gasperini v. Ctr. for Humanities, Inc.</u>, 518 U.S. 415, 427 (1996); <u>Erie R.R. Co. v. Tompkins</u>, 304

**Civil No. 18-1795 (GAG)**

U.S. 64, 78 (1938). To determine whether a state law classifies as "substantive" or "procedural," the Court applies an "outcome-determination" test: "[D]oes it significantly affect the result of . . . litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in State court?" <u>Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas</u>, 957 F.3d 30, 39 (1st Cir. 2020) (citing <u>Gasperini</u>, 518 U.S. at 427). The Court does not apply the "outcome-determination" test to "mechanically . . . sweep in all manner of variations," <u>Gasperini</u>, 518 U.S. at 428; rather, the Court applies it guided by "the twin aims of the <u>Erie</u> rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." <u>Id.</u> (quoting <u>Hanna v. Plummer</u>, 380 U.S. 460, 468 (1965)).

When a state law is substantive in part and procedural in part, the relevant question for <u>Erie</u> purposes is "whether federal courts can give effect to the substantive thrust . . . without untoward alteration of the federal scheme for the trial and decision of civil cases." <u>Gasperini</u>, 518 U.S. at 426. In <u>Gasperini</u>, the Supreme Court acknowledged that a standard of review codified in a New York law was procedural in part because "it assign[ed] decisionmaking authority to New York's Appellate Division." <u>Suero-Algarin</u>, 957 F.3d at 40 (citing <u>Gasperini</u>, 518 U.S. at 426).

Applying the outcome-determination test to the instant case, the Court finds that disregarding the Political Code's venue-of-action statute, P.R. LAWS ANN. tit. 22, § 56, does not significantly affect the result of litigation for a federal court because the same is distinctively procedural. The Political Code's venue-of-action statute can only be read as being procedural since it assigns decision-making authority to a state court. <u>See</u> <u>Gasperini</u>, 518 U.S. at 426 (deciding that New York law was procedural in part because it assigned decision-making authority to state appellate court). Regardless of the venue-of-action statute, the Court will give effect to the substantive thrust of the Political Code without undue alteration of the federal scheme for the disposition of civil cases.

Civil No. 18-1795 (GAG)

      B.  <u>Governmental Claimants</u>

      In addition, PRASA argues in opposition that Travelers still cannot prevail because the special laws that control the disbursement of the remaining contract balance establish a preferential lien in favor of the Commonwealth, its instrumentalities, and the municipal governments. (Docket No. 388 at 12). PRASA avers that between the Governmental Claimants, the Article 1489 Claimants, and Travelers' subrogated claim, the total amount being claimed against the remaining contract balance is $558,674.31. <u>Id.</u> at 13. However, the amount deposited with the Court equals $368,368.93 and the amount being claimed against the remaining contract balance exceeds the funds deposited with the Court. <u>Id.</u> Therefore, PRASA posits that the issue to be addressed by the Court is which claims have preference to the amount deposited with the Court. <u>Id.</u> at 13-14.

      PRASA refers to P.R. LAWS ANN. tit. 31, § 12, to proclaim that in the Commonwealth's statutory scheme, special laws preempt general ones, (Docket No. 388 at 14), and relies on the Puerto Rico Supreme Court's decision in <u>Est. of Evans v. Sec'y of the Treasury</u>, 8 P.R. Offic. Trans 758, 108 P.R. Dec. 713 (P.R. 1979). PRASA argues that the pertinent question is whether the Commonwealth's legislature enacted any special laws that provide a preferential right in favor of Governmental Claimants[14] to collect what is owed to them from the Construction Contract's remaining balance. (Docket No. 388 at 15).

      PRASA argues that this question should be answered in the affirmative and posits that under the Political Code, the Commonwealth and the Municipality of Toa Baja have an absolute preference over all of Aluma's creditors to collect from the remaining contract balance all the taxes that Aluma

---

[14] In the present case, the Commonwealth's Department of the Treasury claimed that Aluma owed it the amount of $61,596.00 in back taxes. In addition, the Commonwealth's Department of Labor and Human Resources claimed that Aluma owed it $18,758.47. Also, the municipality of Toa Baja is claiming that Aluma owed it $84,769.13 for construction excise taxes and municipal license taxes. Finally, the State Insurance Fund Corporation claimed that Aluma owed it $110,487.90 for insurance premiums. (Docket No. 388 at 13).

**Civil No. 18-1795 (GAG)**

owed them. See P.R. LAWS ANN. tit. 22, § 50. (Docket No. 388 at 15). In addition, PRASA cites to the Puerto Rico Court of Appeals' opinion in Mun. of Bayamón v. Rexach Constr. Co., Civil No. FCO2000-0001(401)(S), 2003 WL 21369001 (T.C.A. Apr. 15, 2003) (certified translation provided at Docket No. 271-1), to assert that the statute provides that the Commonwealth has an absolute preferential right to collect first. (Docket No. 388 at 15). Moreover, PRASA advances that the Autonomous Municipality Act "imposes the payment of Construction Excise tax on the contractor," P.R. LAWS ANN. tit. 21 § 4001(ee)(2), and the construction excise tax "imposed by the municipality on the contractor constitutes a preferential lien on all the contractor's assets," pursuant to P.R. LAWS ANN. tit. 21, § 4057b(a), and Mun. of Bayamón, 2003 WL 21369001, at *11-12. (Docket No. 388 at 8, 15). Consequently, PRASA argues that the Political Code, P.R. LAWS ANN. tit. 22, § 50, and the Autonomous Municipality Act, P.R. LAWS ANN. tit. 21, § 4057b(a), provide preferential liens to Governmental Claimants above all general creditors because their credits arise from the legal obligation imposed upon every contractor that has successfully submitted and obtained a bid for a public work. (Docket No. 388 at 16-17).

Furthermore, PRASA also posits that the Municipal License Tax Act, P.R. LAWS ANN. tit. 21, § 651b, the Puerto Rico Government Accounting Act, P.R. LAWS ANN. tit. 3, § 283h(j), the Compensation System for Work-Related Accident Act, P.R. LAWS ANN. tit. 11, § 2, provide preferential liens to Governmental Claimants above all general creditors, including the other Article 1489 claimants and Travelers's subrogated Article 1489 claim. (Docket No. 388 at 24).

Contrarily, Travelers replies that the Puerto Rico Supreme Court addressed the issue of who has the preferential right to monies deposited with the Clerk of the Court between the Commonwealth's Treasury Department and a surety company in New Hampshire Ins. Co. v. Eng. Luis García Passalacqua, 2021 TSPR 7, 2021 WL 664818 (P.R. Jan. 25, 2021) (certified translation

Civil No. 18-1795 (GAG)

provided at Docket No. 418-8). Travelers argues that sureties' claims under Article 1489 have a preferential right to the deposited funds over governmental tax debts. (Docket No. 418 at 6).

In <u>New Hampshire Ins. Co.</u>, the Puerto Rico Supreme Court decided that the surety:

> [B]ecame a direct creditor of the owners of the projects from the very moment it filed its claim and that its credit was not subject to the fluctuations of the responsibilities of the contractor for other concepts. Therefore, it was not a situation that it was necessary to determine the order of preference of creditors' claims. Consequently, it was concluded that [the surety] was entitled to collect—from the time it filed the action in collection of money—the amounts that the contractor company and its subsidiaries and affiliates owed it up to the amount that the owners of the works owed them up to that date.

(Docket Nos. 418 at 6; 418-8 at 17). The Puerto Rico Supreme Court explained that: "[a] reading of the indemnity and surety contracts executed between NHIC, AIICO and Miramar Construction, specifically clause 15(2) of the General Contract of Indemnity, clearly shows that Miramar Construction agreed that from the execution of the referenced contracts, the sureties would subrogate in all its rights, privileges and properties." (Docket Nos. 418 at 6-7; 418-8 at 19). The Puerto Rico Supreme Court noted the "fact that NHIC and AIICO had filed a collection of money action against the contractor—and that it was not filed by virtue of, for example, the direct action allowed by Article 1489 of the Civil Code, P.R. Laws Ann. tit. 31, § 4130—does not suppress rights pursuant to the bond contracts and the subrogation figure and assignment of credits." (Docket Nos. 418 at 6; 418-8 at 20). In view of the foregoing, the Puerto Rico Supreme Court held that:

> [F]rom April 7, 1995—date in which the indemnity contract was executed, the referenced funds came into the patrimony of the sureties, therefore we are not facing some funds that correspond to Miramar Construction and that, therefore the Treasury Department can seize. Such funds belong to NHIC and AIICO. Those are their only creditors.
> That being so, we are not facing a controversy that requires the application of the provisions of order of preference of creditors' claims. Let us remember that the referenced legal provision only applies when several creditors of one same debtor concur in the collection. Deciding the contrary would not only be unjust enrichment by the contractor—for which the sureties complied—but would allow a tax debt—

Civil No. 18-1795 (GAG)

namely Miramar Construction's debt, with the money of a third party that is not the State's debtor.

(Docket Nos. 418 at 7; 418-8 at 20).

As such, Travelers argues that the collaterals, subrogation rights, and assignments in the GAI are just as encompassing as the General Contract of Indemnity in <u>New Hampshire Ins. Co.</u>, specifically, paragraphs "6. Remedies" and "12. Security Interest" of the GAI. (Docket Nos. 418 at 8; 418-9 at 2). Therefore, Travelers concludes that there is no reason why the Puerto Rico Supreme Court's holding in <u>New Hampshire Ins. Co.</u> should not be fully extended and applied to the present case. (Docket Nos. 418 at 8; 418-8 at 20).

The Court previously addressed whether Governmental Claimants have a preferential right to Aluma's overdue debts, such as taxes, in both its Opinion and Order dismissing PRASA's interpleader counterclaim and PRASA's reconsideration of said ruling.[15] (Docket Nos. 229, 331). Herein, PRASA advanced that the Governmental Claimants have a right to the remaining contract balance deposited with the clerk of the Court, (Docket No. 161 at 2-3), and that under Article 9(j) of the Puerto Rico Government Accounting Act, P.R. LAWS ANN. tit. 3, § 283, no payments may be made to a person that has any overdue debt with the Commonwealth of Puerto Rico. (Docket No. 229 at 4-5); <u>Travelers Cas. & Sur. Co. of Am. v. Vázquez Colón</u>, Civil No. 18-1795 (GAG), 2020 WL 3259428, at *2 (D.P.R. June 15, 2020). Therein, the Court held that "[w]hen Travelers filed its Article 1489 claim, PRASA became Travelers's debtor, and its credit is not subject to other considerations related to Aluma," such as its overdue taxes. <u>Id.</u> at 7. Furthermore, the Court also held that "when Travelers submitted its Article 1489 claim, the amount was deducted from the claims of other

---

[15] In its interpleader counterclaim, crossclaim, and third-party complaint, PRASA claimed that while it is ready to release the remaining contract balance, counter defendants, cross defendants, and third-party defendants posit that they have an interest in the funds owed on the remaining contract balance under Article 1489. (Docket No. 86 ¶ 12). As a result, PRASA brought the interpleader action under FED. R. CIV. P. 22 to determine which claimants are subject to the remaining contract balance. <u>Id.</u> ¶ 13.

Civil No. 18-1795 (GAG)

creditors of the contractor." <u>Id.</u> The Court reached these findings applying Article 1489, P.R. Laws Ann. tit. 31, § 4130. <u>Id.</u> at 5-6.

Article 1489 creates a direct action in favor of laborers and materialmen, which allows the subcontractor to recover from the project's owner for services and materials owed to them by the contractor. P.R. Laws Ann. tit. 31, § 4130. "This direct nature of the action produces the important effect of deducting the amount claimed by the laborer or materialmen from the claims of other creditors of the contractor, since from the very moment the claim is made to the owner, the latter becomes the debtor of the contractors, laborers and materialmen." <u>Fed. Ins. Co. v. Constructora Maza, Inc.</u>, 500 F. Supp. 246, 249 (D.P.R. 1990). "Those who furnish their labor and materials in a work agreed upon for a lump sum by a contractor have no action against the owner, except for the amount the latter may owe the former when the action is brought." <u>Goss, Inc. v. Dycrex Constr. & Co., S.E.</u>, 141 P.R. Dec. 342, 350, P.R. Offic. Trans. (P.R. 1996) (quoting P.R. Laws Ann. tit. 31, § 4130). Moreover, once the claim is made, "the owner of the work turns into the debtor of the workers and materialmen and is no longer the debtor of the contractor, to the point that the creditors of the contractor cannot share with the workers and materialmen in the sum owed by the owner." <u>Goss</u>, 141 P.R. Dec. at 352 (citing <u>Am. Sur. Co. v. Superior Court</u>, 97 P.R. 440, 444-45 (P.R. 1969) and <u>Empresas Capote, Inc. v. Superior Court</u>, 103 P.R. Dec. 765, 770, P.R. Offic. Trans. (P.R. 1975)). "Under both the general common and commercial law and under Puerto Rican law, laborers and materialmen have rights to contract retainages which are superior to those of general creditors, even where such funds have been attached by the outside creditor first." <u>Segovia Dev. Corp. v. Constructora Maza, Inc.</u>, 628 F.2d 724, 729 (1st Cir. 1980).

The Court stands by its previous reasoning in the Opinion and Order dismissing PRASA's interpleader counterclaim and the reconsideration of the same. <u>See</u> Docket Nos. 229 at 4-7; 331.

Civil No. 18-1795 (GAG)

Foremost, the Court reminds the parties that unless corrected by an appellate tribunal, a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation. Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997). Because PRASA's present position is more developed than its previous take and now relies on different state laws, the Court is ruling on the matter. As such, the Court holds that neither the Political Code, P.R. LAWS ANN. tit. 22, § 50, nor the Autonomous Municipality Act, P.R. LAWS ANN. tit. 21, § 4057b(a), are applicable and do not trump Article 1489's applicability and binding jurisprudence to the case-at-hand. Once Travelers made its subrogated Article 1489 claims on behalf of the subcontractors that Travelers paid as surety, PRASA became directly indebted to Travelers instead of Aluma, to the point that Aluma's creditors, such as Governmental Claimants for taxes, cannot share with Travelers the sum owed by PRASA to Aluma. See Goss, 141 P.R. Dec. at 352. Moreover, the Court holds that the Municipal License Tax Act, P.R. LAWS ANN. tit. 21, § 651b, the Puerto Rico Government Accounting Act, P.R. LAWS ANN. tit. 3, § 283h(j), and the Compensation System for Work-Related Accidents Act, P.R. LAWS ANN. tit. 11, § 2, are also inapplicable and do not supplant Article 1489's jurisprudence and applicability to this case.

The Puerto Rico Supreme Court's holding in New Hampshire Ins. Co., further supports the previous determination that Travelers became a direct creditor of PRASA from the moment Travelers filed its Article 1489 claim, "that its credit was not subject to the fluctuations of the responsibilities of the contractor for other concepts," and that "it was not a situation that it was necessary to determine the order of preference of creditors' claims." (Docket No. 418-8 at 17). As stated in New Hampshire Ins. Co., the Court is "not facing some funds that correspond to [the contractor] and that, therefore the Treasury Department can seize." (Docket No. 418-8 at 20). The Puerto Rico Supreme Court explained that "[d]eciding the contrary would not only be unjust

Civil No. 18-1795 (GAG)

enrichment by the contractor—for which the sureties complied—but would allow a tax debt—namely [the contractor's] debt, with the money of a third party that is not the State's debtor." Id. This Court is not otherwise persuaded by PRASA's cited case of Mun. of Bayamón from the Puerto Rico Court of Appeals because the Court "is absolutely bound by a current interpretation of that law formulated by the [Commonwealth's] highest tribunal." See Alejandro-Ortiz v. P.R. Elec. Power Auth., 756 F.3d 23, 27 (1st Cir. 2014).

### C.   Article 1489 Claimants

In a similar fashion as the previous argument, PRASA argues in opposition to Travelers' motion for summary judgment that the other Article 1489 claimants have a preferential right to the amount deposited with the Court because they submitted their claims with PRASA before Travelers submitted its claim. (Docket No. 388 at 19-21, 24). Travelers submitted its Article 1489 claim with PRASA on January 3, 2014. (Docket Nos. 376 at 13; 376-1 ¶ 26; 376-7; 388 at 19; 388-1 ¶ 26). Accordingly, PRASA puts forward that the pertinent question is whether any other Article 1489 claimant filed its claim with PRASA before January 3, 2014. (Docket No. 388 at 19). PRASA alleges that ten (10) subcontractors and materialmen[16] notified PRASA of their claim before Travelers between August 2, 2011, and January 8, 2014, and that Travelers was the last Article 1489 claimant. Id. at 20.

Travelers replies that PRASA is mistaken because all these Article 1489 claimants had been paid and PRASA acknowledged their payment by executing Change Order L. (Docket No. 418 at 10-11). In Change Order L, Aluma declared that "all costs incurred for labor, materials, supplies and all other obligations, including those of suppliers and subcontractors, have been paid in full" except for

---

[16] PRASA received Article 1489 claims from the following subcontractors and materialmen: (1) S.P. Fabricator Inc., (2) Roadmarks Corp., (3) GRAINGER, (4) Volvo Rent, (5) R & V Securities Services Inc., (6) MDI Engineers, (7) A-1 Portable Toilet Service, (8) Juan A. Arriaga, (9) Geotechnical Engineers, and (10) HLS Aggregate Transport. (Docket Nos. 388 at 20; 388-6 ¶¶ 14-23).

Civil No. 18-1795 (GAG)

the costs associated with: (1) the Municipality of Toa Baja for storage area and taxes, (2) the Commonwealth for its Workman Compensation State Insurance Fund, (3) Juan A. Arriaga for construction office rental, (4) HLS Aggregate Transport, (5) Travelers/Aluma, and (6) CIAPR Stamps. (Docket Nos. 354-6 at 1; 354-7 at 2). As such, not all Article 1489 claimants have been paid in full because (3) Juan A. Arriaga and (4) HLS Aggregate Transport have yet to be paid according to Change Order L.

The Court notes that according to PRASA's Senior Auxiliary Director of Administration and Finance, (3) Juan A. Arriaga filed its Article 1489 claim on July 29, 2013, for $6,800.00, (Docket Nos. 388-6 ¶ 21), and (4) HLS Aggregate Transport filed its Article 1489 claim on January 8, 2014, for $45,144.20. Id. ¶ 23. Since Travelers filed its subrogated Article 1489 claim on January 3, 2014, before (4) HLS Aggregate Transport, the Court holds that Travelers has priority to the remaining contract balance over HLS Aggregate Transport. Moreover, since (3) Juan A. Arriaga filed his Article 1489 claim before Travelers, $6,800.00 of the remaining contract balance shall be reserved to preserve his recovery from the money deposited with the Court. As such, Travelers can still recover the full amount as the next-in-line Article 1489 claimant because the deposited money (368,368.93 - 6,800.00 = 361,568.93) is still more than $227,024.28, which is the total amount that Travelers requests.

### D.  Contradictory Behavior Doctrine

In the alternative to the previous argument, PRASA argues that Travelers's contradictory actions forbid it from denying the Governmental Claimants' right to collect overdue taxes from the remaining contract balance. (Docket No. 388 at 17-19). PRASA cites to the Puerto Rico Supreme Court's decision in Int'l Gen. Elec. v. Concrete Builders, 4 P.R. Offic. Trans. 1221, 1230, 104 P.R. Dec. 871 (P.R. 1976), to advance that contradictory behavior has no place in the field of law and

**Civil No. 18-1795 (GAG)**

should be prevented. (Docket No. 388 at 19). PRASA alleges Travelers authorized payment to the Internal Revenue Service ("IRS") out of the remaining contract balance but is now denying that same payment to the Governmental Claimants. Id. at 18.

According to record evidence, on May 14, 2015, Sonia Vázquez, PRASA's project administrator, wrote an email to Travelers to inquire about whether Travelers would consent and authorize the payment of Aluma's debt of $40,857.60 to the IRS out of the remaining contract balance. (Docket No. 388-8 at 4). Twenty minutes later, Courtney Mattson, Travelers' claim counsel, replied: "Travelers consents to that payment being released by PRASA to the IRS. . . ." Id. On June 25, 2015, PRASA's project administrator wrote a second email to Travelers's claim counsel regarding another debt of $7,127.08 to the IRS out of the remaining contract balance. (Docket No. 388-9 at 2). Four days later, Travelers's claim counsel responded that Travelers does "not object to this amount ($7,127.08) being released to pay the IRS on behalf of Aluma." Id.

The Court once again disagrees with PRASA's argument and holds that Travelers's actions are not contradictory. While Travelers did indeed permit payment of Aluma's overdue debts to the IRS from the remaining contract balance, Travelers did not permit such payment to either the Commonwealth's Treasury Department or the Governmental Claimants. As such, Travelers has not contradicted itself as to whether it consents to the Governmental Claimants collecting from the remaining contract balance for overdue taxes because Travelers only consented as to the IRS's debt for overdue taxes.

E.   Certification No. 28

Civil No. 18-1795 (GAG)

PRASA continues its array of alternative arguments advancing that Travelers has no right to the remaining contract balance deposited with the Court because PRASA already disbursed the funds according to Travelers' instructions. (Docket No. 388 at 21-23). PRASA argues that Travelers does not have the right to collect from the remaining contract balance because the payment of Certification No. 28 was disbursed from the remaining contract balance and should have been used to pay any outstanding debt from the Construction Project. (Docket No. 388 at 23). Instead, PRASA advances that Travelers utilized the payment of Certification No. 28 to pay outstanding claims from another project. Id.

Travelers replies that the payment of Certification No. 28 was not reimbursement for Travelers's Article 1489 claim but was instead Aluma's payment for work performed in Certification No. 28 as to a different construction project. (Docket No. 418 at 9-10). As explained in Travelers's email to PRASA on January 3, 2014, Aluma owed Travelers $164,076.50 in a different construction project (Colobo Community Water Distribution System) that is also owned by PRASA and bonded by Travelers. (Docket Nos. 376-7 at 2; 388-1 ¶ 19). Travelers states it was paid $164,076.50 as reimbursement for that same amount used to pay different subcontractors of Aluma in a different construction project and not as satisfaction for Travelers's Article 1489 claim in the Construction Project. (Docket No. 418 at 9).

The Court agrees with Travelers. The payment of Certification No. 28 was in relation to a different construction project—the Colobo Community Water Distribution System—as well as two different subcontractors—Water Works and ARO Electrical—and not for what Travelers is owed under Article 1489 in relation to the Construction Project.

F.   Travelers' Claim on the Merits

44

Civil No. 18-1795 (GAG)

1    Having addressed all PRASA's argument in opposition to summary judgment, the Court finds

2    that Travelers has successfully shown that, supported with uncontested facts, it has paid $175,199.70

3    to laborers and materialmen for labor and materials rendered under the GAI and the Bond as Aluma's

4    surety for the Construction Project. (Docket Nos. 85 ¶ 17(a); 376-2 ¶ 15). According to Bond Claim

5    Executive Tim Snyder, Travelers demanded $302.792.59 on July 18, 2016, for payment of loss, costs,

6    and expenses incurred at that time. (Docket Nos. 376-2 ¶ 11; 376-8). Tim Snyder goes on to state that

7    Indemnitors did not pay this debt, causing Aluma to default under the GAI. (Docket No. 376-2 ¶ 12).

8    Furthermore, Tim Snyder explains that Travelers's debt from paying the expenses of the laborers and

9    materialmen increased to $379,708.45 and that it received $204,508.75 in payment, resulting in the

10   current outstanding debt of $175,199.70 owed under Travelers' subrogated Article 1489 claim. Id. ¶¶

11   13-15. Tim Snyder concludes that Travelers has also incurred costs totaling $51,824.58 in attorney's

12   fees and other professional fees investigating the surety claims and prosecuting this action. Id. ¶ 16.

13   In consideration of paying the laborers and materialmen for the goods and services provided,

14   Aluma obtained the right to subrogate these laborer and materialmen's Article 1489 claims against

15   PRASA. See P.R. LAWS ANN. tit. 31, § 4912 ("By virtue of such payment the surety is subrogated in

16   all the rights which the creditor had against the debtor."). After $6,800.00 has been reserved for Juan

17   A. Arriaga, Travelers has priority over the Governmental Claimants as the second-in-line Article

18   1489 claimant for $175,199.70 from the remaining contract balance. Governmental Claimants do not

19   have priority to the remaining contract balance over Article 1489 claimants for overdue debts such

20   as taxes because none of the special laws that PRASA cited are applicable to this case or supplant

21   Article 1489 jurisprudence, which establishes that Article 1489 claimants are the only creditors to the

22   remaining contract balance deposited with the Court. See New Hampshire Ins. Co., 2021 WL 664818.

23

24

Civil No. 18-1795 (GAG)

However, Travelers may not obtain as part of its Article 1489 claim the $51,824.58 incurred costs investigating the surety claims in the Construction Project, prosecuting this action, obtaining releases from laborers and materialmen to which Travelers paid under the Bond, and attempting to collect payment from Indemnitors before this suit was filed, (Docket No. 376-2 ¶ 16), because Article 1489 claims are limited to the amount the owner may owe the laborers and materialmen when the action is brought. See Goss, 141 P.R. Dec. at 350 ("Those who furnish their labor and materials in a work agreed upon for a lump sum by a contractor have no action against the owner, except for the amount the latter may owe the former when the action is brought."). Instead, Travelers may obtain the $51,824.58 from Indemnitors because under the GAI, Indemnitors agreed to exonerate, indemnify, and save Travelers harmless from and against all losses and expenses of any kind or nature. (Docket No. 376-3 ¶¶ 1, 3). As a result, Travelers may not obtain $51,824.58 from the remaining contract balance because Indemnitors owe Travelers for those costs under the GAI instead of PRASA under Article 1489.

G.  Conclusion

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Travelers' motion for summary judgment at Docket No. 376.

VII.    **Travelers' Motion for Judgment On The Pleadings As To Aluma's Counterclaim At Docket No. 375**

Travelers moves for judgment on the pleadings under FED. R. CIV. P. 12(c) to dismiss Aluma's sole counterclaim against Travelers for failing to sign the closing documents of the Construction Project. (Docket No. 375). Aluma's counterclaim against Travelers consists of just one paragraph and reads as follows:

> In refusing to sign the closing documents for the [Construction Project], Travelers caused damage, not only to itself, but also to Aluma, the creditor for the retainage and final change order, referred to above. That is true whether or not Aluma owes money to Travelers. The reason is that the total amount owed for work performed is

larger than the amount claimed by Travelers, even if the payments made by Travelers to PRASA could be validly attributed to the Bond issued to protect PRASA from claims which we deny. To that extent, Travelers owes Aluma $417,480.80 in damages for its failure to sign the closing documents, even though the [Construction Contract] was finished and accepted. That is the amount which would have been paid by PRASA, Burgos for [sic], allegedly, Travelers' refusal to sign the closing documents.

(Docket No. 85 at 19).

Travelers argues that the counterclaim fails to allege a plausible claim for relief, whether it be a breach of contract or negligence claim. (Docket No. 375 at 4-11). Travelers points out that the counterclaim does not contain well-pleaded facts that show the existence of any right against Travelers. Id. at 11. Instead, Travelers indicates that the counterclaim is only supported by "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like[,]" which the Court need not credit. Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). As such, Travelers suggests that the counterclaim should be dismissed because it does not permit the Court to infer even the mere possibility of misconduct, let alone state a plausible, not merely conceivable, case for relief. (Docket No. 375 at 11).

As to the merits of the counterclaim, Travelers avers that the same fails to allege a plausible claim for breach of contract because it fails to show: (1) the existence of a valid contract, (2) a breach by one of the contracting parties, and (3) the real and positive existence of the damages caused. Id. at 4-7; see Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 31 (1st Cir. 2012). Travelers posits that the counterclaim fails to neither identify the parties nor the date of execution of the purported contract as well as its terms and conditions. Id. at 9-11; see Llanos-Torres v. Home Depot P.R., Inc., Civil No. 18-1932 (ADC), 2020 WL 6949042, at *8 (D.P.R. Nov. 24, 2020). Furthermore, Travelers states that even if the Court were to look beyond the alleged facts within the four corners of the counterclaim,

Civil No. 18-1795 (GAG)

Aluma's pleading is completely silent as to any agreement, stipulation, or concession by Travelers in benefit of Aluma in relation to a duty to sign closing documents. (Docket No. 375 at 7).

Moreover, Travelers argues that Aluma does not have a right to sue under the GAI for failing to sign closing documents because it explicitly agreed that Travelers has the right to decline to execute, for any reason, any other consent of surety without incurring any liability or waiving any rights.[17] Id. at 7-9. Travelers interprets this provision of the GAI to mean that Travelers has a contractual right to decline to execute any consent of surety regarding the closing documents. Id. Since it exercised its contractual right to decline to execute a document it did not consent to, Travelers argues that the Court should grant its motion for judgment on the pleadings even if the counterclaim consisted of well-plead facts, which Travelers maintains that it does not. Id.

Travelers also argues that the counterclaim fails to allege a plausible claim for negligence because it fails to show: (1) the existence of a duty requiring Travelers to conform to a certain standard of conduct, (2) a breach of said duty, (3) proof of damages, and (4) a causal connection between the damage and the tortious conduct. (Docket No. 375 at 9-11); see Baum-Holland v. Hilton El Con Mgmt., LLC, 964 F.3d 77, 87 (1st Cir. 2020) (listing four necessary elements to recover for negligence under Article 1802, P.R. LAWS ANN. tit. 31, § 5141). Travelers advances that the counterclaim points to no set of facts indicative of neither fault, negligence, nor noncompliance with any statute or contract. (Docket No. 375 at 9-11); see Suárez-Torres v. Sandia, LLC, Civil No. 16-1882 (PAD), 2017 WL 590307, at *4 (D.P.R. Feb. 14, 2017). Instead, Travelers complains that the

---

[17] Paragraph 8 of the GAI reads,

8. Decline Execution: [Travelers] has the right, for any reason, to decline to execute: (a) any Bond, including final Bonds where [Travelers] provided a bid Bond, (b) any Bond rider or consent authorizing any rider to any Bond; and/or *(c) any other consent of surety, without incurring any liability or waiving any right.*

(Docket No. 33-1 at 2) (added emphasis).

Civil No. 18-1795 (GAG)

counterclaim consists only of threadbare pleadings that do not state plausible claims. (Docket No. 375 at 9-11).

Aluma opposes claiming that the issue of how much Travelers owes Aluma on its counterclaim needs to be adjudicated at trial because Travelers refused to allow disbursements on the final certification and remaining contract balance in order to force Aluma and PRASA to pay Travelers more than it had paid to laborers and materialmen in the Construction Project. (Docket No. 412 at 2). Aluma advances that when Travelers refused to receive the funds and allow the disbursement of over $407,000 that directly led to this complaint, Travelers acted in bad faith. Id. Aluma believes that since PRASA allegedly acted in a negligent or fraudulent manner in the hiring and handling of the Construction Project, Travelers is relieved of the obligation to pay for any laborers or materialmen claims. Id. Thus, Aluma argues that Travelers made those payments of its own free will, not the bonding contract, and therefore neither Aluma nor the remaining Indemnitors have any responsibility to pay the amounts disbursed by Travelers. Id. Aluma reasons that if PRASA is found to have acted negligently and/or fraudulently, Aluma and the Indemnitors would be relieved of any responsibility towards Travelers for any disbursement made in the Construction Project. Id.

Travelers replies clarifying that Aluma mistakenly believes that the current motion for judgment on the pleadings is meant to be considered together with Travelers' alternative motion for summary judgment. (Docket No. 431 at 2). Travelers argues that this is wrong because they are separately filed motions, raise different issues, have different legal standards, and the alternative motion for summary judgment was filed just in case the motion for judgment on the pleadings is denied. (Docket Nos. 387 at 1; 431 at 2). Aluma sur-replies stating that it does not care whether the Court considers Travelers' motions together or separately and reminding the Court that many of Aluma's arguments apply to both motions. (Docket No. 438 at 2).

Civil No. 18-1795 (GAG)

A.  <u>Standard of Review</u>

"A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss." <u>Perez–Acevedo v. Rivero–Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008). In evaluating a motion for judgment on the pleadings, the Court must view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. <u>R.G. Fin. Corp. v. Vergara–Nunez</u>, 446 F.3d 178, 182 (1st Cir. 2006).

"The general rules of pleading require a short and plain statement of the claim showing that the pleader is entitled to relief." <u>Gargano v. Liberty Intern. Underwriters, Inc.</u>, 572 F.3d 45, 48 (1st Cir. 2009) (citations omitted) (internal quotation marks omitted). "This short and plain statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Id.</u> (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).

Under Rule 12(b)(6), a defendant may move to dismiss an action against him for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. The Court must decide whether the complaint alleges enough facts to "raise a right to relief above the speculative level." <u>Id.</u> at 555. In so doing, the Court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. <u>Parker v. Hurley</u>, 514 F.3d 87, 90 (1st Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677–78 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

To assess the adequacy of a pleading, the First Circuit has instructed that the review should be handled like this: "first, isolate and ignore statements in the [pleading] that simply offer legal labels and conclusions or merely rehash cause-of-action elements[,] then take the [pleading's] well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see fi they plausibly narrate a claim for relief." Zenón v. Guzmán, 924 F.3d 611, 616 (1st Cir. 2019) (internal quotations and citations omitted). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the Court] 'to draw on' our 'judicial experience and common sense.'" Schatz v. Republican State Leadership Comm'n., 669 F.3d 50, 55 (1st Cir. 2012) (quoting Iqbal, 556 U.S. at 679). In addition, affirmative defenses may be raised in a motion to dismiss under Rule 12(b)(6) provided that the facts establishing the defense are clear on the face of pleader's pleading. See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008)

B.  Discussion

The Court agrees with Travelers that motions for summary judgment under FED. R. CIV. P. 56 are different than motions for judgment as to the pleadings under FED. R. CIV. P. 12(c) and require separate responses because they raise different issues and have different legal standards.

Despite Aluma's allocution in opposition to Travelers' motion for judgment on the pleadings as well as its sur-reply, the entire pleading of the counterclaim, (Docket No. 85), is devoid of any contractual claims against Travelers. See Llanos-Torres, 2020 WL 6949042, at *8. The only allegation of a contractual claim against Travelers is the following: "It is alleged[] that Travelers had full knowledge of the situation and that it could and should have resolved the Bonding Contract and

**Civil No. 18-1795 (GAG)**

walked away." (Docket No. 412 at 17). This vague and unclear assertion fails to identify the Bonding

Contract's parties, its date of execution, and its terms and conditions. In addition, the whole pleading

is silent as to any other agreement, stipulation, or concession executed by Travelers in benefit of

Aluma besides the Bonding Contract. Aluma never specifies what exactly is the Bonding Contract.

Since Aluma has not elaborated its claims from the conceivable to the plausible, Aluma's argument

fails. See Twombly, 550 U.S. at 570; see also Llanos-Torres, 2020 WL 6949042, at *8.

In addition, Aluma's entire pleading is devoid of any negligence claims against Travelers. See

Suárez-Torres, 2017 WL 590307, at *4. The only allegation of a negligence claim against Travelers

is the following: "It is further alleged[] that the reason was mentioned in the presence of Aluma

representatives and that it was Travelers' fear of incurring PRASA's ire and possibly disqualifying

Travelers as a bond provider for PRASA and/or the government in general. This fact, if proven, would

constitute a clear violation of the duty of care which should, at a minimum, disqualify Travelers from

recovering from Indemnitors, any loss it may have suffered." (Docket No. 412 at 17). However,

Aluma points to no set of facts indicative of fault or negligence. As such, Aluma's argument that

Article 1802 provides an independent source of potential recovery fails because Aluma has not

elaborated its claims from the conceivable to the plausible. See Twombly, 550 U.S. at 570; see also

Suárez-Torres, 2017 WL 590307, at *4.

For the foregoing reasons, the Court **GRANTS** Travelers' motion for judgment on the

pleadings under FED. R. CIV. P. 12(c) at Docket No. 375 and dismisses Aluma's counterclaim.

## VIII.   Travelers' alternative motion for summary judgment as to Aluma's counterclaim at Docket No. 387

In an overabundance of caution, Travelers filed a motion for summary judgment dismissing

Aluma's sole counterclaim against Travelers "just in case the motion for judgment on the pleadings

is denied." (Docket No. 387). Due to the Court's determination granting Travelers' motion for

Civil No. 18-1795 (GAG)

judgment on the pleadings and ordering Aluma's counterclaim be dismissed, Travelers' alternative motion for summary judgment at Docket No. 387 is hence **found as MOOT**.

## IX.   <u>Conclusion</u>

For the foregoing reasons, the Court **DENIES** PRASA's motion for summary judgment at Docket No. 354, **DENIES** Aluma's motion for summary judgment at Docket No. 366, and **GRANTS in part and DENIES in part** Travelers' motion for summary judgment at Docket No. 376. Moreover, the Court **GRANTS** Travelers' motion for judgment on the pleadings as to Aluma's counterclaim at Docket No. 375 and finds as **MOOT** Travelers' alternative motion for summary judgment as to Aluma's counterclaim at Docket No. 387. In addition, the Court **DENIES** PRASA's motion to strike for violations of the anti-ferret rule at Docket No. 381. Furthermore, the Court finds as **MOOT** Aluma's resubmitted motion for summary judgment at Docket No. 353. [18]

**SO ORDERED.**

In San Juan, Puerto Rico this 15th day of September 2021.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge

---

[18] PRASA' motion in limine, (Docket No. 378), and Aluma's motion to strike Aluma's motion in limine, (Docket No. 403), will be decided via a separate ruling forthwith.