**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

TRAVELERS CAS. & SUR. CO. OF AM.,

Plaintiff, Counter Defendant,

v.

ALBERTO VÁZQUEZ COLÓN; HILDA PIÑEIRO CÁCERES; CARLOS GONZÁLEZ TORRES; IVETTE GÓMEZ DÍAZ; MIGUEL BERMÚDEZ CARMONA; ALUMA CONSTR. CORP.; VIEQUES CONCRETE MIX CORP.; INTER-ISLAND FERRY SYS. CORP.; VIEQUES F.O.& G INC., and; PUERTO RICO AQUEDUCTS AND SEWER AUTH.; et al.,

Defendants, Cross Claimants, Counter Claimants, Cross Defendants.

CIVIL NO. 18-1795 (GAG)

### MEMORANDUM ORDER

Pending before the Court is the Puerto Rico Aqueduct and Sewer Authority's ("PRASA") motion for reconsideration of the Court's order denying its motion in limine to exclude the proposed expert opinion of Aluma Construction Corp.'s ("Aluma") expert, CPA Armando Suárez. (Docket No. 448). PRASA advances that, based on admissions of Aluma's President Carlos González and CPA Suárez, two of the prerequisites to use the Modified Total Cost method of calculating damages have not been met. Id. at 8. As such, PRASA argues that Aluma's evidence does not fit its conclusion that the Modified Total Cost is a reliable method to estimate its claim for damages. Id. at 4-7. Aluma opposed. (Docket No. 451). For the foregoing reasons, the Court **DENIES** PRASA's motion for reconsideration at Docket No. 448.

**Civil No. 18-1795 (GAG)**

I. **Standard of Review**

Motions for reconsideration are generally considered under either FED. R. CIV. P. 59 or FED. R. CIV. P. 60, depending on the time in which such a motion is served. Villanueva-Méndez v. Nieves Vázquez, 360 F. Supp. 2d 320, 322 (D.P.R. 2005) (citing Pérez-Pérez v. Popular Leasing Rental, Inc., 993 F.2d 281, 284 (1st Cir. 1993)). A motion for reconsideration cannot be used as a vehicle to relitigate and/or rehash matters already litigated and decided by the Court. Villanueva-Méndez, 360 F. Supp. 2d at 322. Courts generally recognize three valid grounds for Rule 59(e) relief: "an intervening change in the controlling law, a clear legal error, or newly discovered evidence." Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 9 (1st Cir. 2017).

II. **Legal Discussion and Analysis**

Rule 703 provides that an expert's testimony may be based on inadmissible evidence so long as those facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. FED. R. EVID. 703; see United States v. Perocier, 269 F.R.D. 103, 107 (D.P.R. 2009), *adopted by* Perocier, Crim. No. 08-243 (JAG), Docket No. 299 (Dec. 10, 2009). In the amendments to the Federal Rules of Evidence, the committee explained the relationship between Rules 702 and 703. FED. R. EVID. 702 committee notes on rules – 2000 amendment (2000); see Perocier, 269 F.R.D. at 108. The committee explained that "the sufficiency of the basis of an expert's testimony is to be decided under Rule 702" as part of deciding "the ultimate reliability of the expert's opinion," while "[i]n contrast, the 'reasonable reliance' requirement of Rule 703 is a relatively narrow inquiry." FED. R. EVID. 702 committee notes on rules – 2000 amendment (2000); see Perocier, 269 F.R.D. at 108. The committee stated that while the trial court may determine under Rule 703 that the expert may rely on the inadmissible information, "the question whether the expert is relying on a *sufficient* basis of information—whether admissible information or not—is governed

by the requirements of Rule 702." FED. R. EVID. 702 committee notes on rules – 2000 amendment (2000) (original emphasis); see Perocier, 269 F.R.D. at 108.

The First Circuit has not directly dealt with Rule 703 in the Daubert context. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); see Perocier, 269 F.R.D. at 108. In related precedent, the First Circuit upheld a district court's requirement that an expert testify about the "unorthodox" evidence underlying his conclusions in order to aid the district court's assessment of reasonable reliance under Rule 703. Perocier, 269 F.R.D. at 108; see Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1218 (1st Cir. 1993); see also United States v. Corey, 207 F.3d 84, 89 (1st Cir. 2000) ("Rule 703 does require that the trial judge act as an independent 'gatekeeper' to ensure that there is sufficient, credible evidence that experts do rely on the specified types of sources in formulating their opinions"). An expert may rely on facts or data that have not been admitted into evidence if the expert's reliance is reasonable as "measured against the facts on which experts in the particular field normally rely." Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 544 (1st Cir. 1988) (company's financial records and interviews with company personnel were "obvious[ly] sources of information normally and reasonably relied upon by accountants"); see Perocier, 269 F.R.D. at 108.

Following the Supreme Court's decision in Daubert, the Third Circuit considered Daubert's application to Rule 703. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 747-49 (3d Cir. 1994); see Perocier, 269 F.R.D. at 108. The Third Circuit held that Daubert's direction to district courts to play a "gatekeeping function" with respect to expert testimony applied equally to a determination under Rule 703's requirement that the underlying data on which an expert opinion is based is "of a type reasonably relied upon." In re Paoli R.R. Yard, 35 F.3d at 748; see Perocier, 269 F.R.D. at 108. In doing so, "the judge must conduct an independent evaluation of reasonableness" which may take

**Civil No. 18-1795 (GAG)**

into consideration both the expert's opinion that other experts rely on that type of evidence, as well as any "other factors [the judge deems] relevant." In re Paoli R.R. Yard, 35 F.3d at 748. "If the underlying data is so lacking in probative force and reliability that no reasonable expert could base an opinion on it, an opinion which rests entirely upon it must be excluded." In re Agent Orange Prod. Liab. Litig., 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985); see Perocier, 269 F.R.D. at 108.

The preferred way for a contractor to prove increased costs is to submit actual cost data because such data "provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that—equitable—and not a windfall for either the government or the contractor.'" Propellex Corp. v. Brownlee, 342 F.3d 1335, 1338-39 (Fed. Cir. 2003) (quoting Dawco Constr., Inc. v. United States, 930 F.2d 872, 882 (Fed. Cir. 1991), *overruled on other grounds by* Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995)).

The modified total cost method is a modification of the total cost method. Propellex, 342 F.3d at 1339. Under the total cost method, the measure of damages is the difference between the actual cost of the contract and the contractor's bid. Id.; see Raytheon Co. v. White, 305 F.3d 1354, 1365 (Fed. Cir. 2002). The total cost method "has always been viewed with disfavor, in part because of concerns about bidding inaccuracies, which can reduce the contractor's estimated costs, and performance inefficiencies, which can inflate its actual expenditures." Raytheon, 305 F.3d at 1365; see Servidone Constr. Corp. v. United States, 931 F.2d 860, 861-62 (Fed. Cir. 1991). Moreover, the total cost method does not distinguish costs for which the government is responsible from costs that the contractor should bear. Raytheon, 305 F.3d at 1365; see Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970). In fact, the total cost method has been used "only when no other mode was available and when the reliability of the supporting evidence was substantiated." Raytheon, 305 F.3d at 1356 (quoting WRB Corp. v. United States, 183 Ct. Cl. 409, 426 (Ct. Cl. 1968)). Despite this

**Civil No. 18-1795 (GAG)**

risk, the Court condones the total cost method in those extraordinary circumstances where no other way to compute damages is feasible and where the Court employed proper safeguards. Servidone, 931 F.2d at 862; see Great Lakes Dredge & Dock Co. v. United States, 96 F. Supp. 923, 926 (Ct. Cl. 1951), *cert. denied*, 342 U.S. 953 (1952); Boyajian, 423 F.2d at 1241.

The modified total cost method is the total cost method adjusted for any deficiencies in the contractor's proof in satisfying the requirements of the total cost method. Propellex, 342 F.3d at 1339; see Servidone, 931 F.2d at 861. In examining claims based on a total cost or a modified total cost methodology, the district court has always required safeguards to ensure, to the extent possible, that the burden of excess expenditures falls on the party responsible for them. Raytheon, 305 F.3d at 1365-66; see Servidone, 931 F.2d at 862; Boyajian, 423 F.2d at 1238-42; Great Lakes, 96 F. Supp. at 926. Thus, the plaintiff must prove that "(1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses." Raytheon, 305 F.3d at 1366 (quoting WRB Corp., 183 Ct. Cl. at 426). See generally Stephen A. Hess, Annotation, *"Total Cost Method (or Approach)" and "Modified Total Cost Method (or Approach)" to Providing Damages in Federal Contract Cases*, 200 A.L.R. Fed. 475 (2005).

As noted, Aluma advances its claim using the Modified Total Cost method. PRASA argues the Court committed a clear error of law by analyzing whether the Modified Total Cost method was scientifically sound and methodologically reliable under Rule 702 instead of ensuring that the aforementioned prerequisite safeguards to use it had been established under Rule 703. (Docket No. 448). Specifically, PRASA argues that Aluma failed to establish both the first prerequisite—that Aluma show that no other damage calculation method is available—and the fourth prerequisite—

that Aluma show the proper allocation of damages between its own causes and those of PRASA. Id. at 2-7.

The Court agrees that it erred when it analyzed the scientific soundness and methodological reliability of Aluma's proposed expert's opinion, which focused exclusively on the Modified Total Cost method without considering its prerequisite safeguards. As such, the Court now turns to the merits of whether the contested prerequisite safeguards have been established.

In regard to the first safeguard, PRASA argues that another alternative method (namely, the measurement approach) was available to estimate loss of productivity, which would contradict the first safeguard that the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of certainty. (Docket No. 448 at 5-7). PRASA identifies that Aluma first employed the Modified Total Cost method in its June 16th and 18th, 2014, claim letters to PRASA. (Docket Nos. 378-3; 378-5; 448 at 6). PRASA notes, however, that the measurement approach was the method Aluma had used in its previous claim letters to PRASA. (Docket Nos. 378-1; 378-2; 448 at 6, n.7). PRASA also remarks that CPA Suárez never considered other methods, such as the previously used measurement approach, in reaching his conclusion. (Docket Nos. 378-12 at 12; 448 at 6). Instead, CPA Suárez opines that no other reasonable method to determine damages existed. (Docket No. 378-12 at 10-12). He states that:

> the frequency and nature of the arrears and [different site conditions] were of such magnitude that they prevented segregation of costs. We have examined the frequency and nature analysis of the arrears prepared by Aluma and costs accumulated for the Project and, we believe that Aluma will be able to demonstrate to the Court that this condition is met.

(Docket No. 378-12 at 12). Consequently, PRASA argues that Aluma's evidence is not enough to establish the first safeguard to use the Modified Total Cost method. (Docket No. 448 at 6-7).

Aluma responds that no other alternative method was feasible because the 124 different site conditions made it extremely difficult and costly for Aluma to collect and organize the information necessary to assign portions of the costs using the measurement approach. (Docket No. 451 ¶ 24). Furthermore, Aluma explains that the claim letters that used the measurement approach were: (1) prepared when only 21 different site conditions had surfaced and (2) presented before the delays exceeded the 1-year contractual time originally allotted for completion. (Docket Nos. 378-3; 451 ¶ 25). Aluma clarifies that the remaining 103 different site conditions overlapped in substantial and unpredictable manners that PRASA provided allowances for aspects of the work that the parties knew would be included but had not been sufficiently articulated in the plans and specifications. (Docket Nos. 382-1 ¶¶ 15-17; 451 ¶ 25). Aluma highlights that the allowances are evidence of the chaos that overwhelmed the project, making the collection of information impossible, which was further exacerbated by PRASA's improper design.[1] (Docket No. 451 ¶ 26). Aluma points out that CPA Suárez noted these difficulties associated with the different site conditions in his expert report and the subsequent allowances to address these new site conditions. (Docket Nos. 378-12 at 6-8, 12-16; 451 ¶ 30). Aluma concludes that it became impossible to precisely identify and assign indirect costs, such as the loss of productivity, because of the 124 different site conditions encountered. Id. ¶ 27. Consequently, Aluma posits that the modified total cost method was the only reasonable alternative to calculate its damages, thus establishing the first safeguard. See Raytheon, 305 F.3d at 1366 (plaintiff must prove that nature of particular losses make it impossible or highly impracticable to determine them with reasonable degree of accuracy).

---

[1] Aluma notes that PRASA "had no concrete idea of what was going on in the sub-surface of the project site but knew it would be troublesome. Yet, they decided not to spend money needed to find out." (Docket No. 451 ¶ 26).

Second, PRASA argues that Aluma's own inefficiency in the Construction Project cannot be distinguished from that of PRASA, which would violate the fourth safeguard. Id. at 2-5. PRASA points out that CPA Suárez, Aluma's first proposed expert, admitted that he lacks the expertise to estimate Aluma's inefficiency since this estimate is a "technical engineering task that will be subject of expert engineer evaluation, (i.e., usually done by people with experience in the construction field)." (Docket Nos. 378-12 at 25; 448 at 3 n.3). PRASA further points out that Aluma's second proposed expert, Engineer Rafael Pérez-Jiménez, never proffered any determination about Aluma's inefficiency and that Aluma failed to produce its own inefficiency report. (Docket No. 448 at 3). Nevertheless, despite admitting that he is not qualified as an engineer, CPA Suárez used in his calculation of damages an estimate that Aluma's own inefficiency caused 2.5% of the total cost for the Construction Project.[2] (Docket No. 378-12 at 25). PRASA notes that CPA Suárez's 2.5% estimate is solely based on Aluma President Carlos González's sworn statements, which the Court had previously disregarded in Aluma's motion for summary judgment because they were impermissibly self-serving and conclusory as well as disclosed after discovery ended. (Docket Nos. 440 at 27; 448 at 4). In his deposition testimony, President González explained that his 2.5% estimate was based on his personal knowledge of the construction industry and his workers' level of production. (Docket No. 448-1 at 2-3). As such, PRASA argues that CPA Suárez's supposed expert estimate of 2.5% is arbitrary because it is not based on his expert opinion but rather adopts wholesale the biased and lay estimate of Aluma's President. (Docket No. 448 at 4-5). Since Aluma cannot establish the proper allocation of damages between its own causes and those of PRASA, PRASA argues that CPA Suárez cannot use the modified total cost method to calculate damages. Id. at 5.

---

[2] CPA Suárez states that although Aluma has no specific knowledge of costs and delays that could be attributed to it, "based on what they consider as experience, have attributed 2.5% of the project's direct costs as damages attributed to Aluma." (Docket No. 378-12 at 16).

**Civil No. 18-1795 (GAG)**

Aluma responds by arguing that there is no evidence on the record as to the fourth prerequisite that Aluma committed any inefficiency whatsoever, not even 2.5%. (Docket No. 451 ¶¶ 48-49). Aluma states that it cannot calculate an item that does not exist (inefficiency) because it is a logical impossibility. Id. Still, Aluma understands that no one is perfect and, as such, has assessed against itself 2.5%, the determination of which "is a matter for the experience of the company and/or its pertinent functionaries, applied to the known conditions of the" Construction Project.[3] Id. ¶ 48. Even with this 2.5% inefficiency, Aluma proclaims that not one single day of delay or inappropriate performance was attributed to Aluma on the record. (Docket Nos. 366-9 at 75; 451 ¶ 49). Aluma suggests that all delays and their corresponding costs were the result of the different site conditions and the change orders issued by PRASA to correct them. (Docket No. 451 ¶ 49). As such, Aluma argues that by virtue of the construction contract, PRASA is responsible for all costs generated by change orders and any other contractors. Id. at 20. In short, Aluma argues that it caused 0% of the total costs because PRASA is responsible for all the costs incurred in relation to the different site conditions that caused the inefficiencies, "except for rain and such," as shown by the fact that not a single day of delay or inappropriate performance was attributed to Aluma. Id. Therefore, Aluma concludes that the modified total cost method is appropriate because Aluma was not responsible for the added expenses, thus establishing the fourth prerequisite safeguard. See Raytheon, 305 F.3d at 1366 (plaintiff must prove that it was not responsible for added expenses).

The Court agrees with Aluma. As to the first safeguard, the Court finds that, after reviewing the change orders and given the nature of its claim in the instant case, Aluma has demonstrated the impracticability of proving its actual losses directly for the costs associated with the different site

---

[3] Aluma notes that the 2.5% estimate "is simply an opinion, but an educated one, based on experience assigning and measuring such values when bidding for projects." (Docket No. 451 ¶ 48).

**Civil No. 18-1795 (GAG)**

conditions. The exact amount of additional work that Aluma had to perform because of the problems with the foundation at the construction site is difficult, if not impossible, to determine because of the intertwined nature of the corrective work being performed. See American Line Builders, Inc. v. United States, 26 Cl. Ct. 1155, 1181-82 (Ct. Cl. 1992); J.D. Hedin Constr. Co. v. United States, 171 Ct. Cl. 70, 86-87 (Ct. Cl. 1965). Adverse weather, additional trenching, re-excavation, and muddy conditions caused difficulties and slowed down the performance of fixing the sewage system. Although Aluma had calculated the costs associated with the first 21 different site conditions using a different method (the measurement approach), the chaos that ensued permeated for an additional two years of construction and made it impracticable to continue using this more accurate method. PRASA's allowances are evidence of the Construction Project's mayhem that made collection of information impossible. As such, Aluma has demonstrated that the nature of the particular losses made it unfeasible to determine them with a reasonable degree of accuracy, and therefore no other alternative damage calculation method was available.

As to the fourth safeguard, the Court finds that Aluma has demonstrated that none of the costs associated with the different site conditions could be traced to it, the contractor. Aluma's incurred costs stem from PRASA's change orders that addressed the different site conditions. Aluma claims that the different site conditions occurred because of PRASA's willful ignorance of the problems with the foundation at the construction site. Moreover, Aluma notes that it was not blamed for any of the delays stemming from the different site conditions. As such, Aluma has demonstrated that it was not responsible for the added expenses and thus establishes the fourth safeguard. PRASA's argument fails because experts in the field of construction reasonably rely on a company's corporate officers to form their conclusions. See Int'l Adhesive Coating, 851 F.2d at 544-45.

**Civil No. 18-1795 (GAG)**

### III. Conclusion

For the foregoing reasons, the Court **DENIES** PRASA's motion for reconsideration at Docket No. 448.

**SO ORDERED.**

In San Juan, Puerto Rico this 15th day of October 2021.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge