UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

TRAVELERS CAS. & SUR. CO. OF A.M.,    )
    )
   Plaintiff/Counterclaim Defendant,    )
    )
        v.    )    No. 3:18-cv-1795-JAW
    )
ALBERTO VÁZQUEZ-COLON, et al.    )
    )
   Defendants/Counterclaim Plaintiff.    )

**ORDER ON MOTION FOR RECONSIDERATION**

After the Court granted a surety's motion for disbursement of funds, including attorney's and other professional fees, the appearing defendants filed a motion for reconsideration. The appearing defendants ask the Court to reconsider its conclusion that the surety may recover monies deposited in the registry of the court for attorney's and other professional fees because the surety maintains UCC-1 guarantee protection and taxing authorities do not have priority over the surety. The parties additionally dispute the amount of attorney's fees in question. The Court concludes that the surety maintains UCC-1 guarantee protection but that taxing authorities with a priority interest predating the event of default hold a priority interest above that of the surety for attorney's and other professional fees. The Court orders the appearing defendants to file a memorandum showing the date of default, which taxing authorities held priority interests on that date, the amounts of those priority liens, and the viability of the workers' compensation category as a tax.

## I.     RELEVANT BACKGROUND AND PRIOR ORDERS

### A.     Background of the Dispute

On September 10, 2010, the Puerto Rico Aqueduct and Sewer Authority (PRASA) and Aluma Construction Company (Aluma) entered into a contract titled "Agreement for the Rehabilitation and Completion of the Marisol, Kennedy, Vegas, and Camaselles Sanitary Sewer System, Sabana Seca Ward, Toa Baja, Puerto Rico." *Omnibus Opinion & Order* at 4 (ECF No. 440).  The construction project is called the Toa Baja Project.  *Am. Compl.* ¶ 21 (ECF No. 33).  The owner of the construction project is PRASA, and the general contractor is Aluma.  *Id.*  Travelers Casualty and Surety Company (Travelers) entered into a General Agreement of Indemnity (GAI) in favor of Aluma and issued three separate payment and performance bonds to Aluma as Principal, securing its performance and fulfillment of three different construction contracts, as well as payment for labor, materials, and equipment furnished for use in the performance of the Bonded Projects.  *Am. Compl.* ¶ 21.  Among the three Bonded Projects is the Toa Baja Project.  *Id.*

On October 4, 2012, Alberto Vázquez Colón, Hilda Piñeiro Cáceres, Carlos González Torres, Evette Gómez Díaz, and Miguel Bermúdez Carmona (collectively Individual Indemnitors) subscribed to the GAI in favor of Travelers.  *Id.* ¶ 18.  On December 14, 2012, Aluma, Vieques Concrete Mix Corporation (Concrete), Inter-Island Ferry System Corporation (Inter-Island), and Vieques F.O. & G., Inc. (F.O. & G.) (collectively Corporate Indemnitors) subscribed to the GAI and the Individual

Indemnitors executed individual affidavits acknowledging their execution and commitment to the terms and conditions of the GAI. *Id.* ¶ 19.

When the Corporate Indemnitors and the Individual Indemnitors failed to comply with their contractual obligations, Travelers paid a total net amount of $301,143.62 in claims from Aluma's subcontractors, workers, materialmen, and others in the Toa Baja Project. *Id.* ¶ 25. On October 22, 2018, Travelers filed suit against the Individual Indemnitors, Corporate Indemnitors, and PRASA for indemnification of the amounts Travelers expended pursuant to its obligations under the GAI. *Compl.* at 1-8. On February 14, 2019, Travelers filed an amended complaint. *Am. Compl.* (ECF No. 33) (*Am. Compl.*).[1] In addition to its indemnity claims, Travelers asserted that it had paid claims from Aluma's subcontractors, workers, materialmen, and others in the Toa Baja Project in the total amount of $301,143.62 and that Travelers was, therefore, subrogated against the Puerto Rico Aqueducts and Sewer Authority (PRASA) in that amount. *Id.* ¶ 32.

## B.   Subsequent Developments

Travelers' straightforward claims against the owner of the construction project and the indemnifiers soon devolved into a complicated dispute among PRASA, Aluma, and the indemnifiers as to who was responsible for construction delays and cost overruns in the Toa Baja Project. *See Answer to the Am. Compl., Countercl. and Crosscl.* (ECF No. 36); *Am. Answer to the Am. Compl., Am. Countercl. and Crosscl.*

---

[1]   On February 13, 2019, Travelers moved to amend its complaint. *Travelers' Mot. for Leave to Am. Compl.* (ECF No. 27). On February 14, 2023, then-United States District Judge Gelpí granted Travelers' motion to amend. *Order* (ECF No. 30). The Amended Complaint filed on February 14, 2019 is the operative complaint. *Am. Compl.* (ECF No. 33).

(ECF No. 46); *Travelers Cas. and Sur. Co. of Am.'s Answer to the Am. Countercl.* (ECF No. 57); *Puerto Rico Aqueduct and Sewer Auth. Mot. to Dismiss Am. Crosscl.* (ECF No. 65); *Second Am. Answer to the Am. Compl., Second Am. Countercl., Second Am. Crosscl. and Third Party Compl.* (ECF No. 85); *Interpleader Countercl., Cross-Cl. and Third Party Compl.* (ECF No. 86).   On July 31, 2019, Travelers filed a motion for judicial deposit pursuant to Federal Rule of Civil Procedure 67 and 28 U.S.C. § 1335, and on August 30, 2019, the Court granted the motion.   *Mot. for Judicial Deposit* (ECF No. 87); *Order* (ECF No. 131).   On September 6, 2019, PRASA deposited $368,368.93 with the Clerk of Court; the amount currently deposited with the Clerk of Court and available for distribution is $374,186.08.

These developments led to extensive motion practice, legal argument, and delay.

C.   **Omnibus Opinion and Order**

On September 15, 2021, then-United States District Court Judge Gustavo A. Gelpí issued an extensive, fifty-three-page omnibus opinion and order, resolving most of the issues in the case.   *Omnibus Opinion & Order* (ECF No. 440) (*Omnibus Order*). In the order, Judge Gelpí denied PRASA's motion for summary judgment against Aluma, *id.* at 16, denied Aluma's motion for summary judgment against PRASA, *id.* at 29, granted in part and denied in part Travelers' motion for summary judgment against PRASA and the indemnitors, *id.* at 53, granted Travelers' motion for summary judgment against Aluma and dismissed Aluma's counterclaim, *id.* at 52,

4

and dismissed as moot Travelers' alternative motion for summary judgment against Aluma. *Id.* at 52-53.

Judge Gelpí concluded that Travelers "has priority over the Governmental Claimants as the second-in-line Article 1489 claimant for $175,199.70 from the remaining contract balance." *Omnibus Order* at 45. Judge Gelpí rejected Travelers' claim for an additional $51,824.58 of incurred costs because "Article 1489 claims are limited to the amount the owner may owe the laborers and materialmen when the action is brought," explaining that "Travelers may not obtain $51,824.58 from the remaining contract balance because Indemnitors owe Travelers for those costs under the GAI instead of PRASA under Article 1489." *Id.* at 46.

### D.    Travelers' First Motion for Reconsideration and Denial

On September 22, 2021, Travelers filed a motion for reconsideration of the omnibus order and requested that the Court issue a judgment in its favor and order the disbursement of funds. *Travelers Cas. and Sur. Co. of Am.'s Mot. for Recons. of Omnibus Opinion & Order, Req. Entry of J. and for Disbursement of Funds* (ECF No. 445) (*First Mot. for Recons.*). On October 1, 2021, Judge Gelpí denied Travelers' motion for reconsideration. *Mem. Order* (ECF No. 450) (*Denial of First Mot. for Recons.*).

In its motion, Travelers asked Judge Gelpí not only to reconsider the part of his omnibus order that limited its claim to $175,199.70, but also to order the Clerk to distribute either the $175,199.70 or $227,143.90 ($175,199.70 + $51,944.20) from the funds PRASA had deposited with the Clerk of Court. *First Mot. for Recons.* at 6.

5

On October 1, 2021, Judge Gelpí issued a memorandum order, addressing Travelers' motion for reconsideration.[2]  *Denial First Mot. for Recons.* at 1-7.  Judge Gelpí disagreed with the part of Travelers' claim that demanded the additional $51,824.58 because "Travelers' claim is limited to the amount that the owner (PRASA) may owe the laborers and materialmen when the action is brought."  *Id.* at 3.

### E.    Travelers' Second Motion for Reconsideration and Order

On October 27, 2021, Travelers filed a motion for reconsideration of the order on its motion for reconsideration.[3]  *Travelers Cas. and Sur. Co. of Am.'s Mot. for Recons. of Mem. Order* (ECF No. 460) (*Second Mot. for Recons.*).  In this motion, Travelers argued that it maintained the right to collect its incurred costs because the deposited funds belonged to PRASA, noting that once PRASA deposited the retainage with the Clerk, it relinquished any claim in the retainage, which now "belongs . . . to Aluma and its creditors."  *Id.* at 2.  Travelers asserted that it is an Aluma creditor for the $51,824.58 it is owed from Aluma, *Second Mot. for Recons.* at 5, and urged the Court to certify the case under Federal Rule of Civil Procedure 54(b) so that the judgment will have the requisite finality.  *Id.* at 6-9.

On September 27, 2022, this Court granted Travelers' motion for reconsideration.  *Order on Mot. for Recons., Mots. in Limine, and Remand to Puerto*

---

[2]    In his October 1, 2021 order, Judge Gelpí granted a motion to correct a clerical error not at issue here.  *Denial First Mot. for Recons.* at 4.

[3]    On November 3, 2021, before Judge Gelpí ruled on Travelers' second motion for reconsideration, he was appointed to the Court of Appeals for the First Circuit, and the case was reassigned first to United States District Judge Jay Garcia-Gregory, *Mem. of Clerk* (ECF No. 462), and then on June 28, 2022, to this Judge.  *Order Reassigning Case* (ECF No. 471).

*Rico Commonwealth Ct.* (ECF No. 476).  The Court reasoned that "absent a claim by PRASA for some or all the deposited amount, the corpus deposited in the Court is correctly viewed as money once retained by PRASA, the owner, and due Aluma, the general contractor, subject to the claims of Aluma's creditors."  *Id.* at 8 (citing *Fed. Ins. Co. v. Constructora Maza, Inc.*, 500 F. Supp. 246, 250 (D.P.R. 1979)).  The Court concluded that Travelers "demonstrated its entitlement to a total of $227,024.28 ($175,199.70 + $51,824.58) from the $368,368.93 retainage that PRASA held for the benefit of Aluma and deposited in the Clerk's Office pursuant to Federal Rule of Civil Procedure 67."  *Id.* at 9.

The Court additionally ordered Travelers to file a motion "complying fully with the withdrawal requirements of Federal Rule of Civil Procedure 67 and Local Rule 67," *id.* at 10, and "defer[ed] ruling on the Rule 54(b) relief Travelers request[ed]" because it "anticipate[d] resolving the jurisdictional issue in the relatively near future," noting that "[i]f the Court remands the remainder of the case, a final judgment will issue at that time."  *Id.* at 12.

Finally, the Court ordered counsel for the remaining defendants to "address whether, if the Court decide[d] not to retain jurisdiction, the Court should remand the case to the commonwealth of Puerto Rico courts and, if so, which court, and whether the Court should dismiss the state claims without prejudice and allow the parties to reinitiate them in the state court of their choosing."  *Id.* at 14-15.

On October 4, 2022, Travelers filed its motion for disbursement of funds.  *Mot. for Disbursement of Funds* (ECF No. 477).  On October 28, 2022, Alberto Vazquez

Colon, Hilda Piñeiro Cáceres, and their Conjugal Partnership, Carlos Gonzalez Torres, Ivette Gomez, and their Conjugal Partnership, Miguel Bermudez Carmona, Aluma Construction Corporation, and Vieques F.O. &G., Inc. (jointly "the appearing defendants") filed a memorandum in compliance with the Court's September 27, 2022 order, *Mot. in Compliance with Order* (ECF No. 485), and an opposition to the request to withdraw funds. *Opp'n to Disbursement of Consigned Funds for Att'y Fees and/or Mot. for Recons.* (ECF No. 486). On the same day, PRASA filed its memorandum in compliance with the Court's order. *PRASA's Br. to Comply with Ct. Order at ECF No. 476* (ECF No. 487). On November 11, 2022, Travelers filed its reply to the appearing defendants' opposition to disbursement of the funds for attorney's fees and other professional fees. *Travelers' Reply to Indemnitors' Opp'n to Disbursement of Funds* (ECF No. 500).

On January 3, 2023, the Court granted in part and dismissed without prejudice in part Travelers' motion for disbursement of funds. *Order on Mot. for Disbursement of Funds* (ECF No. 509). The Court concluded that Travelers could recover monies deposited in the registry of the court for costs and expenses it incurred, including attorney's and other professional fees, because the surety maintains UCC-1 guarantee protection and taxing authorities do not have priority over the surety. The Court additionally concluded that the amount of the attorney's fees and the nature and amount of the other professional fees remained in dispute.

**F.      The Appearing Defendants' Present Motion for Reconsideration**

On January 24, 2023, the appearing defendants filed a motion for reconsideration of the Court's January 3, 2023 order on disbursement of funds. *Mot. for Recons.* (ECF No. 511) (*Defs.' Mot.*).  On January 25, 2023, the Court held a videoconference of counsel and ordered the parties to file a joint position on amount of attorney's fees or a proposal on resolution of attorney's fees by February 22, 2023. *Minute Entry for Proceedings* (ECF No. 512).  On February 23, 2023, Travelers filed its response to the appearing defendants' motion for reconsideration.  *Travelers' Opp'n to Indemnitors' Mot. for Recons.* (ECF No. 519) (*Travelers' Opp'n*).  On March 21, 2023, the appearing defendants filed their reply.  *Reply to Opp'n to Mot. for Recons.* (ECF No. 532) (*Defs.' Reply*).  On April 12, 2023, Travelers filed its sur-reply. *Travelers' Surreply* (ECF No. 543) (*Sur-reply*).

On April 3, 2023, after granting numerous time extensions, the Court entered an order concluding that the parties had not agreed to attorney's fees because they submitted no filing as to their position on the amount or a proposal of resolution of attorney's fees.  *Order* (ECF No. 536).  On April 18, 2023, the appearing defendants filed an informative motion regarding the attorney's fees controversy. *Mot. Informing Status of Objection to Travelers' Timesheets to the Honorable Court* (ECF No. 549) (*Mot. on Status of Att'ys Fees*).   On May 8, 2023, Travelers filed its response. *Travelers' Opp'n to Indemnitors' Mot. Informing Status of Obj. to Travelers' Time Sheets* (ECF No. 553) (*Opp'n to Mot. Informing Status of Att'ys Fees*).

## II.     THE PARTIES' POSITIONS

### A.     The Appearing Defendants' Motion for Reconsideration

In its motion for reconsideration, the appearing defendants ask the Court to reconsider two conclusions regarding the attorney's and other professional fees from the Court's January 3, 2023 Order on Disbursement of Funds: (1) "that Travelers had a properly perfected lien over the . . . funds" and (2) that "even if the lien was not valid, Travelers had a right to the funds pursuant to the holdings of *New Hampshire Insurance Company v. Passalacqua*, 206 D.P.R. 105 (2021)." *Defs.' Mot.* at 2.

### 1.     The UCC-1 Guarantee Agreement

The appearing defendants first address "whether Travelers has a valid <u>lien</u> over the funds," urging that it does not. *Id.* at 3-7 (emphasis in appearing defendants' motion). The appearing defendants submit that "[o]n January 17, 2012, Puerto Rico amended its Commercial Code in order to shorten the period for a UCC-1 lien from ten (10) to five (5) years . . . [with] effective date . . . one (1) year after the passage of the Law." *Id.* at 3. According to the appearing defendants, the relevant portion of the amended law provides: "**<u>Five-year effectiveness.</u>** Except as otherwise provided in subsections (b), (e), (f), and (g), a filed financing statement is effective for a period of ten years after the date of filing." *Id.* at 4 (quoting Law No. 21, of 2012, amending P.R. Stat. Ann. Tit. 19 § 2335(a)) (emphasis in appearing defendants' motion). The appearing defendants contend that "a superficial reading of Section 9-515 [and] its sub-sections . . . should leave no doubt that, as of[] the effective date of the law the applicable duration of effectiveness of a financing statement was five (5) years." *Defs.'*

*Mot.* at 4.  The appearing defendants further contend that "[t]he legislative history of the 2014 Amendment clearly states that, regarding the five (5) year duration, the amendment was to provide a '*purely **technical** amendment to clarify*' what the intention of the Legislature had been . . . which was to reduce the duration of UCC-1 filings to five (5) years." *Id.* at 5 (quoting H.B. 1438).  The appearing defendants insist that the 2014 Amendment made "no alteration" to this provision and "[o]nly the second sentence in the statute was altered to make it homogenous with the first sentence in the statute – a '*purely technical*' amendment" that "simply made it clearer that the duration was five (5) years." *Id.* (quoting H.B. 1438).

The appearing defendants submit that the Court misinterpreted *Altair Global Credit Opportunities Fund (A), LLC v. Puerto Rico AAA Portfolio Bond Fund, Inc. (In re The Financial Oversight & Management Board)*, 914 F.3d 694 (1st Cir. 2019), and that "*Altair* does not apply to the case at hand . . . [because t]he UCC-1 filed in *Altair* pre-dated the passage of Law 21 by several years." *Defs.' Mot.* at 6.  The appearing defendants conclude that [t]he 2014 amendments could not have been intended to alter the five-year period applicable at the time of Travelers' filing" because this "could be easily construed as a regulatory taking and for the benefit of third parties," which "was not the asserted purpose of said laws." *Id.*

### 2.    Priority of Government Taxing Authorities under Puerto Rico Law

The appearing defendants argue that because Travelers' lien was not properly protected and title did not transfer to Travelers under the GAI until default occurred,

government taxing authorities have priority over these funds under Puerto Rico law. *Id.* at 7-10.

The appearing defendants first address *New Hampshire Insurance Company*. *Id.* at 7-8. They contend that "[t]he problem in applying *New Hampshire Insurance Company* reasoning to the case at hand is twofold[:]" "the language . . . [of the] bonding contract [in that case] . . . has a small but important difference to the one signed between the parties in this case" and "at least part of, the debts currently owed to the taxing authorities correspond to a date prior to the signing of the GAI in December 14, 2012, and definitely prior to any '*event of default*' which could have conceivably transferred title of the funds to Travelers." *Id.* at 9 (emphasis in appearing defendants' motion). Specifically, the appearing defendants contend that while the GAI in *New Hampshire Insurance Company* stated that "as of this date . . . the said Surety shall be subrogated to all of their rights, privileged and properties," the GAI here instead provides that "in the event of a default, Indemnitors assign, convey and transfer to the Company all of their rights, title and interests in the property." *Id.* at 8 (internal quotations and citation omitted). According to the appearing defendants, "[a]s per Travelers' GAI, the alleged transfer of title could not occur **until an event of default had transpired**, but obviously no time prior to the signing of the GAI on December 14, 2012." *Id.* at 8-9 (emphasis in appearing defendant's motion).

Next, the appearing defendants submit that "the legal lien that protects tax assessments was the law long before the signing of the [GAI] in 2012" and "at least

part of the debts currently owed to the taxing authorities correspond to a date prior to the signing of the GAI." *Id.* at 9. According to the appearing defendants, [t]he preferential liens held by the taxing authorities were in place when the alleged 'transfer of title' occurred" and "[t]hus, the alleged 'transfer of property' to Travelers could not have occurred due to the pre-existing nature of the tax debt liens." *Id.* The appearing defendants conclude that "[a]t the very least, the Court needs to hold an evidentiary hearing to establish when the tax debts were incurred *vis a vis* the date that the 'default' occurred in order to establish who has the prior claim to the funds." *Id.*

### B.   Travelers' Opposition to Motion for Reconsideration

Travelers first submits that the Court should not consider the appearing defendants' motion for reconsideration because "[a] motion for reconsideration which presents new arguments is not appropriate under Rule 59(e)," and the appearing defendants "had almost two months to move the court for leave to file a surreply and raise any argument related to Travelers' UCC-1 position" in response to Travelers' October 4, 2022 Motion for Disbursement of Funds, which they failed to do. *Travelers' Opp'n* at 1-2. Travelers further submits that the appearing defendants "waived their tax debt liens argument" because "nowhere in their affirmative defenses did [they] ever suggest that Travelers did not have a right to the retainage because of preferential tax debt liens." *Id.* at 2-3. Travelers then argues that the appearing

defendants "do not have standing to defend the alleged interests of the taxing authorities."[4]  *Id.* at 3-6.

### 1.      The UCC-1 Guarantee Agreement

Regarding the UCC-1 financing statement, Travelers submits that the applicable "law was crystal clear that a financing statement filed for the first time 'is effective for a period of *ten* years after the date of filing.'"  *Id.* at 7 (quoting P.R. Laws Ann. § 9-515(a)) (emphasis in original).  According to Travelers, "the law, as enacted, did not shorten the period for a UCC-1 lien from 10 years to five years . . . [instead i]t shortened the continuation of the initial financing from a period of 10 years to five years."  *Id.*  Travelers contends that "[t]his means that the UCC-1 financing statement filed by Travelers, as well as the many thousand other financing statements filed during the year 2013 before the Department of State, are effective for a period of ten years after the date of filing."  *Id.* (internal citation and quotations omitted).  Travelers further contends that its position is supported by the Department of State Circular Letter 2014-1 and the fact that § 9-515(a) was later amended in 2014 to reduce the initial period from ten to five years without retroactive effect.  *Id.* at 7-8.  According to Travelers, the Circular Letter makes clear "that Travelers' lien has a 10-year duration because it was filed before January 15, 2014," *id.* at 9, and that

---

[4]      Although the parties spend significant portions of their briefing arguing standing, the Court does not address this argument at length because it concludes that the appearing defendants do have standing to request that the Court determine, according to the law, whether taxing authorities have a priority lien over Travelers' lien for its attorney's and other professional fees.  To have standing, a party must at a minimum "show that [they] personally ha[ve] suffered some actual or threatened injury."  *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979).  Here, the appearing defendants will suffer injury if the Court wrongfully distributes money to Travelers for its attorney's and other professional fees that belong to the taxing authorities, who may later seek those same funds from the appearing defendants.

"the Puerto Rico Legislature is perfectly aware that, if they want a purely technical amendment to be retroactive, the amendment must state that it is retroactive." *Id.* at 10.

### 2. Priority of Government Taxing Authorities under Puerto Rico Law

Travelers submits that the appearing defendants "misinterpret" the GAI and "[a]s a matter of common sense . . . are mistaken in their interpretation of the phrase 'in the event of a Default,'" as this phrase means that the appearing defendants "assign, convey and transfer their assets to Travelers now so that Travelers can protect itself in case the event of Default occurs." *Id.* at 11. Travelers contends that under Puerto Rico law, if the terms of a contract are clear and unambiguous, the contract shall be interpreted as such and upheld. *Id.* Travelers further contends that "[a]pplying Puerto Rico law to [the GAI], it is clear that [appearing defendants] are assigning, conveying, and transferring to Travelers all of their rights, title, and interest in Property effective on the date of the execution of the GAI" because "the relevant language is in the present tense." *Id.* at 12. Travelers concludes that "[t]he GAI is meant to protect the surety when a contractor defaults" and to interpret the GAI as the appearing defendants propose "makes the GAI nothing more than a worthless piece of paper because most, if not all, of the assets of the contractor will have already been encumbered by the contractor as he attempted to stave off inevitable debt." *Id.* at 13.

Regarding the appearing defendants' assertion that the Court must hold an evidentiary hearing to establish when the tax debts were incurred, Travelers asserts

that the appearing defendants "are mistaken" because "hearings are necessary when there are issues of contradictory or conflicting evidence," and "[t]here are no such issues in this case." *Id.* at 14. According to Travelers, the appearing defendants "have never offered any evidence of any tax debt incurred before the execution of the GAI, before their contractual default, or at any time whatsoever." *Id.*

## C.     The Appearing Defendants' Reply

The appearing defendants first contend that their motion for reconsideration "does not raise new arguments," *Reply* at 2-3, they "did not waive the argument of the preferential lien and/or priority status of the taxing authorities over the retainage," *id.* at 4-5, and they "have standing to raise the arguments" now. *Id.* at 6-7.

Regarding the UCC-1 financing statement, the appearing defendants submit that "the letter of the law and the intent of [the] original 2012 law was to reduce the length of the lien from ten (10) years to five (5) years," and with the 2014 Amendment, "[t]he legislators simply decided that the language in the original law passed in 2012 was not clear enough and wanted to make it simpler and clearer to avoid any future doubts." *Id.* at 7. According to the appearing defendants, the subsequent 2014 Amendment and its legislative history "does not mean that the 2012 Law provided a length of ten (10) years to the UCC-1's," and "[t]here is simply no support for that contention." *Id.*

Regarding the GAI and the taxing authorities, the appearing defendants argue that based on the clear language of the GAI, "[t]he alleged transfer of the proprietary

interest to Travelers would only occur upon an event of default," unlike in *New Hampshire Insurance Company*, where the transfer took place on the day the GAI was executed. *Id.* at 8. According to the appearing defendants, "[t]here can be no other way to interpret the wording of the GAI," and Travelers' "convoluted interpretations are not even consistent with the plain language of the GAI." *Id.* at 9. The appearing defendants contend moreover that because the GAI is a contract of adhesion drafted by Travelers, "any ambiguity . . . is to be interpreted against the drafting party." *Id.* In conclusion, the appearing defendants submit that "there is one final problem with Travelers' argument," which is that "[e]ven if Travelers is correct in its interpretation of the GAI . . . the transfer of property interest could not have occurred prior to the date of the signing of the GAI." *Id.* at 10. The appearing defendants insist that "[w]hether the legal lien or priority interest over the retained funds by the taxing authorities predates December 4, 2012 is something that has to be established at trial." *Id.*

### D. Travelers' Sur-Reply

The Court summarizes only Travelers' arguments central to the merits of the motion for reconsideration before the Court today. Travelers contends that the appearing defendants "misinterpret the clear language of the GAI" and that they offer no "support for their contention that as per the Travelers' GAI, the alleged transfer of title did not occur until an event of default has occurred." *Pl.'s Sur-Reply* at 11 (internal citation, quotations, and emphasis omitted). Travelers further contends that the appearing defendants "are attempting to create an inexistent ambiguity so

that they can argue that, since the GAI is a contract of adhesion, the phrase 'in the event of default' should be interpreted against travelers." *Id.* According to Travelers, however, "the law is clear that ambiguity does not exist simply because the parties disagree about the proper interpretation of a contractual provision." *Id.* at 11-12. Travelers submits that under Puerto Rico law, "[w]hen construing a contract, the stipulations 'should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together," whereas here "Travelers directed the court to specific stipulations in the GAI that support the court's conclusion." *Id.* at 12 (quoting P.R. Laws Ann. Tit. 31, § 3475).

## III.   DISCUSSION

### A.   The UCC-1 Guarantee Agreement

The Court revisits whether the 2012 Amendment to § 9-515(a) altered the duration of an initial UCC-1 financing statement from ten years to five years. The Court concludes that it did not. The Court further determines that the subsequent 2014 Amendment did not retroactively shorten the duration of initial UCC-1 financing statements filed between the effective date of the 2012 Amendment and the effective date of the 2014 Amendment. The Court thus concludes once again that Travelers' August 14, 2013 financing statement, filed between the effective date of the 2012 Amendment and the 2014 Amendment, is valid for ten years from the date of filing. Travelers therefore maintains UCC-1 guarantee protection until August 14, 2023.

### 1.    The 2012 Amendment

In 2012, Puerto Rico enacted an amendment to the existing § 9-515, intending to change § 9-515(a) to provide for a five-year duration for initial financing statements rather than a ten-year duration.  The 2012 Amendment altered § 9-515(a) to provide: "Five-year effectiveness.  Except as otherwise provided in subsections (b), (e), (f), and (g), a filed financing statement is effective for a period of *ten* years after the date of filing."  Act No. 21 of January 17, 2012, 2012 P.R. Laws 162 (codified at P.R. STAT. ANN. TIT. 19 §2335(a)) (emphasis in original); *see* H.B. 2965.  Although later legislative history indicates that the Puerto Rico legislature intended to write *five* rather than *ten* in the text of the law, they made a technical error and wrote *ten* instead.[5]

### 2.    The 2014 Amendment

In 2014, Puerto Rico enacted another amendment to correct this technical error and to change § 9-515(a) such that initial financing statements expire after a period of five years rather than ten years, in line with their intention in the 2012 Amendment.  Act No. 17 of January 16, 2014, 2014 P.R. Laws 162 (codified at P.R. Laws Ann. Tit. 19 §2335(a)).  With the 2014 Amendment, the Legislature changed §

---

[5]    In its commentary on the 2014 Amendment, the Legislature provided:

> Through Act No. 21 of January 17, 2012, our Chapter 9 was replaced in order to adopt the Revised Article 9 of the UCC as well as conform our Chapter 9 to the 50 states which had already adopted such Revised Article 9. As part of such efforts, Act No. 21, supra, proposed to reduce the effective period of financing statements to five (5) years, just as other states.  However, due to a technical error, in Section 9-515(a) of Chapter 9, reference was made to a ten (10)-year period, whereas, in the title and other relevant provisions, reference was made to a five (5)-year period.

H.B. 1438 at 1 (English trans. found at ECF No. 552, Attach 1, *Translation of H.B. 1438* at 1).

9-515 to read: "Five (5)-year effectiveness.   Except as otherwise provided in subsections (b), (e), (f), and (g), a filed statement is effective for a period of five (5) years after the date of filing." H.B. 1438 at 3.  The 2014 Amendment does not contain a statement concerning retroactivity.  *See* P.R. Stat. Ann. Tit. 19, § 2335.

After the Puerto Rico Legislature enacted the 2014 Amendment, the Department of State issued a Circular Letter clarifying the "time limit for filing continuation statement of financing statement in light of Act 17-2014 [the 2014 Amendment]."  P.R. Department of State Circular Letter 2014-01, *Clarifications on Term for Filing Continuing Financing Statements Based on Law 17-2014* at 1 (Jan. 24, 2014) (English Trans.) (*Circular Letter*).[6]  In its Circular Letter, the Department of State provided:

> On January 16, 2014, Act 17-2014 took effect . . . It is important to point out that before Section 9-515(a) of reference was amended, the Act provided for a ten (10) year effective period for initial financing statements . . . **Such reduction of the effective period of initial financing statements from ten (10) to five (5) years, implemented through Act No. 17-2014, cannot be retroactive.**
>
> Act No. 17-2014 does not contain a provision on retroactivity. Article 3 of the Civil Code of Puerto Rico provides that laws shall not have a retroactive effect unless it is otherwise expressly provided. 31 L.P.R.A. § 3. Furthermore, it provides that under no circumstance shall the retroactive effect of a law adversely affect rights acquired under a prior law. *Id.*
>
> . . . **By virtue of the foregoing, it is hereby clarified that the five (5) year effective period of initial financing statements shall apply to such statements filed from January 16, 2014, onward.**

---

[6]      A certified English translation of the Circular Letter can be found at ECF No. 531, Attach 1, *Circular Letter*.

> Providing otherwise would affect a right acquired by the holder of a lien perfected on personal property.
>
> This implies that **initial financing statements filed on or before January 15, 2014, have an effective period of ten (10) years.**

Circular Letter at 1-2 (emphasis in original).

Although the Department of State's Circular Letter is not law, the First Circuit has recognized it as a guiding principle on these matters. The First Circuit faced a similar situation in *Altair Global Credit Opportunities Fund (A), LLC v. Puerto Rico AAA Portfolio Bond Fund, Inc. (In re The Financial Oversight & Management Board)*, 914 F.3d 694 (1st Cir. 2019). In *Altair*, the appellants submitted a 2008 financing statement and then submitted financing statement amendments in 2015 and 2016. *Id.* at 711-12. The opposing party argued "the Financing Statements could not later satisfy the requirements for perfection, by amendment, because the 2008 Financing Statements had lapsed by the time the Financing Statement Amendments were filed" because "[t]he Commonwealth's enactment of a revised Article 9 . . . shortened the effective time period of an initial financing statement from ten to five years." *Id.* at 712.

In *Altair*, the First Circuit held that the 2008 financing statements had not lapsed when the financing statement amendments were filed about seven and a half years later because the ten-year, not the five-year, rule applied to the 2008 financing statements. *Id.* The First Circuit noted that the amended law, "which clarified that the effective time period of financing statements was five years, does not contain a statement concerning retroactivity" and reasoned that "as a textual matter, we would expect that a provision intended to apply retroactively to financing statements would

directly mention [so], particularly given the Commonwealth's long-standing requirement that a law must 'expressly so decree' in order to have retroactive effect." *Id.* (quoting P.R. Laws Ann. Tit. 31, § 3). The First Circuit explained that "the general provision of the Commonwealth Civil Code . . . states that '[i]n no case shall the retroactive effect of a law operate to the prejudice of rights acquired under previous legislative action.'" *Id.* at 713 (quoting P.R. Laws Ann. Tit 31, § 3). Even though the P.R. Department of State Circular Letter "does not have the force of law," the First Circuit reasoned it is "informative on this issue," and noted that the P.R. Department of State "considered the amendment to the time period 'for the life of an initial financing statement' and concluded that the decrease to five years 'cannot be retroactive.'" *Id.* at 712-13 (quoting Circular Letter).

The appearing defendants argue in their motion for reconsideration that "*Altair* does not apply to the case at hand [because t]he UCC-1 filed in the *Altair* case pre-dated the passage of Law 21 by several years," whereas "Travelers filed its UCC-1 eight months <u>after</u> the effective date of Law 21." *Defs.' Mot.* at 6 (emphasis in appearing defendants' motion). The Court disagrees.

In fact, in *Altair*, when discussing the duration of initial financing statements, the First Circuit made clear that "'for initial financing statements filed on or before January 15, 2014, the term is ten (10) years.'" *Altair* 914 F.3d at 713 (quoting Circular Letter) (cleaned up). The Court concludes that the First Circuit addressed this same question in *Altair* and found under the "informative" guidance of the Circular Letter that only financing statements filed after January 15, 2014 have an

initial duration of five rather than ten years.  *Id.*  In line with the Puerto Rico

Department of State Circular Letter and First Circuit precedent, the Court concludes

that Travelers' UCC-1 financing statement filed on August 14, 2013—months before

the January 15, 2014 cutoff—is valid for ten years from the date of filing and thus

did not expire until August 14, 2023.  Travelers therefore maintains UCC-1

guarantee protection until August 14, 2023.[7]

The Court turns to whether the liens held by governmental claimants hold

priority over Travelers' "preferred position" under its UCC-1 registered indemnity

agreement.

### B.    Priority of Government Taxing Authorities

In their motion for reconsideration, the appearing defendants ask the Court to

reconsider its conclusion that governmental taxing authorities do not hold priority

over Travelers' contractual lien, including attorney's and other professional fees.[8]

---

[7]      Even though the UCC-1 expired during this extended litigation, the Court assumes that the filing of the lawsuit to enforce the UCC-1 effectively extends the expiration date while the litigation is pending.

[8]      The Court is not revisiting its determination that Travelers is entitled to recover attorney's and other professional fees from the funds PRASA deposited with the Court.  The language of the General Agreement of Indemnity is especially clear on this point:

> **Loss** – All loss and expense of any kind or nature, <u>including attorneys' and other professional fees</u>, which Company incurs in connection with any Bond or this Agreement, including but not limited to all loss and expense incurred by reason of Company's: (a) making any investigation in connection with any Bond; (b) prosecuting or defending any action in connect with any Bond; (c) obtaining the release of any Bond; (d) recovering or attempting to recover Property in connection with any Bond or this Agreement; (e) enforcing by litigation otherwise any of the provisions of this Agreement; and (f) all interest accruing thereon at the maximum legal rate.

*Pl.'s Mot. for Summ. J.*, Attach. 3, *General Agreement of Indemnity* at 1 (ECF No. 244).  The Court is revisiting only whether governmental claimants hold priority liens over the contractual lien including attorney's and other professional fees established by the GAI.

Specifically, the appearing defendants urge the Court to reconsider its application of *New Hampshire Insurance Company* due to what they claim are key differences in the language of the GAI in *New Hampshire Insurance Company* and the GAI between the appearing defendants and Travelers.  The Court concludes that government taxing authorities with a priority lien in existence before the date of default hold priority over Travelers' contractual lien for attorney's and other professional fees.

### 1.    Puerto Rico Law and its Application to the Case

Title 22, § 50 of the Laws of Puerto Rico provides in relevant part: "With the exception of any taxes which the contractor may owe to the Commonwealth of Puerto Rico, the salaries and wages earned by the workers and employees on the work shall have absolute preference with regard to payment over the rest of the debts of the contractor."  22 L.P.R.A. § 50.  Article 1824 of the Civil Code more broadly provides: "With respect to all other personal and real property of the debtor," credits "in favor of the Commonwealth of Puerto Rico, the Municipal Revenue Collection Center, or the corresponding municipality, for the taxes of the last five (5) delinquent annual assessments and the current unpaid assessment which is not included in subsection (1) of § 5193 of this title" shall have preference.  31 L.P.R.A. § 5194;  *see also* 3 L.P.R.A. § 283h(j) ("That if the natural or juridical person from whom an amount is to be withheld should be in debt with the Commonwealth of Puerto Rico and simultaneously with one or more municipalities, the debt to the Commonwealth shall be collected in the first place, and the others successively and strictly on the basis of their maturity dates, always collecting the earliest one first").

Although commonwealth law generally provides government taxing authorities with priority over non-Article 1489 claimants, this rule is not absolute. In *New Hampshire Insurance Company*, the Supreme Court of Puerto Rico faced a similar scenario and held that the sureties had priority over the Treasury Department, a governmental taxing authority that had filed a claim for disbursement of taxes owed.[9]  206 P.R. Dec. 105.  The *New Hampshire* Court noted that the sureties were in a preferred position over the Treasury Department with respect to the funds deposited in the court, reasoning that the sureties became the owner of the court-deposited funds on the date the indemnity contract with the assignment clause was executed.  *Id.* at 125.

The appearing defendants urge the Court to reconsider its application of *New Hampshire Insurance Company* due to allegedly key differences in the language of the GAI in *New Hampshire Insurance Company* and the presently disputed GAI.

But first the Court addresses Travelers' point on waiver.  This case has now been pending since October 22, 2018, and has been extensively and thoroughly litigated, yet appearing defendants did not raise the *New Hampshire* argument until their January 24, 2023 motion for reconsideration.  That said, the Supreme Court of Puerto Rico did not decide *New Hampshire* until January 25, 2021 so the argument that the appearing defendants should have raised the issue as an affirmative defense is less persuasive.  *New Hampshire*, 206 D.P.R. at 105.  Moreover, the appearing defendants raised governmental taxation priority in their October 28, 2022 opposition

---

[9]      A certified translation of *New Hampshire Insurance Company*, 206 P.R. Dec. 105, can be found at *Travelers' Reply to Mot. on Disbursement of Funds*, Attach 2 (ECF No. 500).

to disbursement and request for reconsideration. *Opp'n to Disbursement of Consigned Funds for Att'y Fees and/or Mot. for Recons.* at 3-4, 6-7 (ECF No. 486).

A motion for reconsideration is available where "new and important evidence, previously unavailable, has surfaced" or where the original order was "premised on a manifest error of law." *Ira Green, Inc. v. Military Sales & Serv. Co.*, 775 F.3d 12, 28 (1st Cir. 2014). Here, where the question is whether governmental taxing authorities should have priority over sureties, the Court in its discretion has revisited the issue because of its significance to the taxpayers of Puerto Rico and to the sureties. The Court is also determined to the extent possible to issue a decision that is correct on the law and therefore, acting in its discretion, the Court concludes that it will not impose a waiver on the appearing defendants' defense and will instead reach its merits.

The Court agrees that there is a relevant distinction between these contracts. In *New Hampshire Insurance Company*, the GAI provided that "[t]he indemnitor(s) do hereby jointly and severally agree as of this date, that the said Surety shall be subrogated to all of their rights, privileges, and properties." *New Hampshire Ins. Co.* at 108. The GAI between the appearing defendants and Travelers instead provided that "[i]n the event of a default, Indemnitors assign, convey and transfer to the Company all of their rights, title and interests in the property." *Travelers' Reply to Indemnitors' Opp'n to Disbursement of Funds*, Attach 3, *General Agreement of Indemnity* ¶ 6 (GAI).

Homing in on this distinction, the appearing defendants submit that "[a]s per the Travelers' GAI, the alleged transfer of title could not occur until an event of default had transpired, but obviously at no time prior to the signing of the GAI on December 14, 2012." *Defs.' Mot.* at 9. Travelers argues that the appearing defendants are "mistaken in their interpretation of the phrase 'in the event of a default'" when they "propose to the court that the phrase constitutes the date when everything that follows the comma will take effect." *Travelers' Opp'n* at 11.

The Court disagrees with Travelers that the appearing defendants are mistaken. The definition of "in the event of" is "if (something) happens." *In the event of*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/in%20the%-20event%20of (last accessed May 4, 2023). Following this common definition, the GAI between the parties reads: "[If a default happens], Indemnitors assign, convey and transfer to the Company all of their rights, title and interests in the property." *GAI* ¶ 6. This language indicates that only upon default do the rights transfer to Travelers. *Cf. Fid. & Deposit Co. of Md. v. Big Town Mech.*, No. 2:13-cv-00380-JAD-GWF, 2018 U.S. Dist. LEXIS 238030, at *3-4 (D. Nev. Jan. 4, 2018) ("Travelers and Big Town also entered into a General Agreement of Indemnity (GAI) that assigned all of Big Town's rights under the subcontracts to Travelers *if* Big Town defaulted [when the GAI provided]: In the event of Default, Indemnitors assign, convey and transfer to [TRAVELERS] all of their rights, title and interests in Property") (emphasis added, capitalization in original).

Nonetheless, looking at the contract as a whole, it seems to require complete indemnification. The first clause of the GAI provides "WHEREAS, in the transaction of business, Bonds have heretofore been and/or may hereafter be executed by Company. In connection with the execution, delivery and/or assumption of obligations of such Bonds, Company requires complete indemnification." *GAI* at 1. Because a transfer of rights at the time of default likely conflicts with the possibility of complete indemnification here, the Court applies the law of contract interpretation to resolve the apparent conflict.

The common law rules of contract interpretation state that "an ambiguous contract should be construed against the drafting party." *LFC Lessors v. Pac. Sewer Maint. Corp.*, 739 F.2d 4, 7 (1st Cir. 1984); *accord Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995). "The rationale behind this rule is to 'protect the party who did not choose the language from an unintended or unfair result.'" *Cappellini v. Mellon Mortg. Co.*, 991 F. Supp. 31, 39 (D. Mass. 1997) (quoting *Mastrobuono*, 514 U.S. at 63). Because the GAI is a contract of adhesion drafted by Travelers, the Court construes any ambiguity in favor of the appearing defendants. *See Cappellini*, 991 F. Supp at 39 (Adhesion contracts are "standard form printed contracts prepared by one party and submitted to the other on a 'take it or leave it' basis") (quoting *Standard Oil Co. of California v. Perkins*, 347 F.2d 379, 385 n.5 (9th Cir. 1965)). The Court thus interprets the ambiguity here to mean that the rights, title, and interests in the property transferred to Travelers at the time of default. The Court therefore concludes that taxing authorities hold a priority lien over Travelers'

attorney's and other professional fees to the extent that the taxing authorities were owed money by the appearing defendants before the date of default.

According to the appearing defendants, "[a]t this time, the date of the alleged 'default' is not before the Court." *Defs.' Mot.* at 9.  The Court agrees that the date of the default is not evident in the record, and therefore it cannot determine which taxing authorities were owed money by the appearing defendants at the time of default and in what amount.[10]  In the case that the amount owed to government claimants exceeds the remaining funds—as the appearing defendants have represented—Travelers may be unable to collect its attorney's and other professional fees from the appearing defendants.  However, if the amount does not exceed that remaining in the fund, Travelers will be entitled to collect for its attorney's and other professional fees.

Finally, the Court is not certain that the parties agree as to the amounts and viability of the taxing authorities' claims.  The amount of the taxing authorities' claims appears in a footnote.  *See Opp'n to Mot. for Disbursement of Funds* at 3 n.6. The footnote references the following categories and amounts: (1) $78,000.00 in

---

[10]   In the appearing defendants' opposition to Travelers' motion for disbursement of funds, they provide:

T]he claims from the taxing authorities include those in Change Order L and the Treasury Department, whose claim was not included in Change Order L (because there was an active payment plan at the time):

| | |
|---|---|
| Workman's Compensation | - $78,000.00 |
| Municipal Patent and Taxes (Mun. Toa Baja) | - $84,769.14 |
| Treasury Department | - $71,000.00 |
| Total: | $ 233,769.14 |

*Opp'n to Mot. for Disbursement of Funds* at 3 n.6.

workman's compensation, (2) $84,769.14 in municipal patent and taxes, and (3) $71,000.00 to the Treasury Department. *Opp'n to Mot. for Disbursement of Funds* at 3 n.6.

Absent objection to the amounts, the categories of municipal patent and taxes payable to the municipality of Toa Baja and to the Treasury Department would appear to fall within a common scope of taxation; the category of workman's compensation, however, does not strike the Court as a levy. *See* 22 L.P.R.A. § 50 ("With the exception of any <u>taxes</u> which the contractor may owe to the Commonwealth of Puerto Rico, the salaries and wages earned by the workers and employees on the work shall have absolute preference with regard to payment over the rest of the debts of the contractor") (emphasis supplied); *see also* 31 L.P.R.A. § 5194 (referring to "taxes of the last five (5) delinquent annual assessments"). It may be that workers' compensation fits within a separate category of "wages owed" or "payroll", but if so, it is not clear from the submissions. *See* 22 L.P.R.A. § 50 ("a payroll covering the wages owed"); *but see* 3 L.P.R.A. § 283h(j) (referring to being "in debt with the Commonwealth of Puerto Rico and simultaneously with one or more municipalities"). As the parties have not addressed this issue, the Court will give them an opportunity to do so. Thus, in addition to the submitting the amount of the taxing authorities' claims, the Court requires the parties to confirm whether the amounts are in dispute and address the viability of the claims, particularly the worker's compensation category.

## C.    Attorney's and Other Professional Fees

The appearing defendants object to Travelers' request for attorney's fees on multiple grounds.  First, they object because "Travelers did not present time sheets to be approved by the Court."  *Mot. on Status of Attorney's Fees* at 1.  Specifically, they "object to 192 hours for a total of $32,674.00."  *Id.* at 2.  They also assert that in the case attorney's fees are reached by the Court, "since they are contractual in nature, the question of whether Travelers is entitled to the contested amounts is something that the jury needs to adjudicate."  *Id.*

Travelers submits that the appearing defendants have "waived any objection to Travelers' timesheets" because "during the timesheet discussions, [they] never informed Travelers that it had failed to provide sufficient information to allow them to determine whether the fees are contestable."  *Opp'n to Mot. Informing Status of Att'ys Fees* at 1-2.  Travelers further submits that "[e]very single entry, including those where a word or two may have been redacted to protect the attorney client communication privilege, clearly states, describes, and provides much more than the 'sufficient information' required by the Court."  *Id.* at 2.  According to Travelers, "nothing supports the Indemnitors' allegation, neither factually nor legally," and their "failure to develop any factual or legal argument explaining the basis of its objection is considered a waiver of its objection to said hours."  *Id.* at 2-3.  Finally, Travelers contends that the "amount of attorney's fees is to be determined by the court" because "there is no substantive law applicable to this case that requires that

the amount of attorney's fees . . . be proved at trial as an element of damages." *Id* at 5.

The Court dismisses Travelers' request for attorney's fees for two reasons. First, a "by-the-numbers" analysis of the net amounts potentially available suggests there may be no case or controversy on the issue of attorney's fees. At the least, the parties may wish to reexamine the viability of the attorney's fees dispute because there may not be any money for attorney's fees for the Court to rule on. Namely, the current amount available on deposit with the Court is about $374,186.08.[11] Assuming that the government's priority tax claim is either $233,769.14 or $155,769.14, depending on whether the workers' compensation figure is properly included, this would reduce the amount on deposit to between $140,416.94 ($374,186.08 - $233,769.14) and $218,416.94 ($374,186.08 - $155,769.14). Judge Gelpí concluded that Travelers "has priority over Governmental Claimants as the second-in-line Article 1489 claimant for $175,199.70 from the remaining contract balance." *Omnibus Order* at 45. If the first figure of $140,416.94 is correct, there would be no funds available to distribute for attorney's fees and if the second figure of $218,416.94 is correct, there would be $43,217.24 remaining on court deposit for attorney's fees. As the first figure is possible, the Court will not issue what could be an advisory opinion on a disagreement that may not turn out to be a case or controversy. U.S. CONST., Art. III, § 2, Clause 1; *Boston Teachers Union, Local 66 v. Edgar*, 787 F.2d 12, 16 (1986) ("'When the issues presented are no longer live or the

---

[11]    The Clerk's Office supplied this figure as of September 25, 2023 plus interest and minus fees.

parties lack a legally cognizable interest in the outcome,' the case is moot") (quoting *Cnty. Of Los Angeles v. Davis*, 440 U.S. 486, 496 (1969)) (cleaned up).

Second, to the extent the parties disagree on the amount of attorney's fees, they have not provided the Court with any basis to rule on the proper amount. Appearing defendants object to certain amounts and, in response, Travelers contends that the appearing defendants waived the right to challenge its claimed attorney's fees. *Mot. on Status of Att'ys Fees* at 1-3; *Opp'n to Mot. Informing Status of Att'ys Fees* at 1-6. If the parties determine that the controversy about attorney's fees is real, the Court will confer with counsel and discuss the next steps on this issue, including whether the parties are entitled to a jury trial to find disputed facts.

## IV.   CONCLUSION

The Court GRANTS the appearing defendants' motion for reconsideration (ECF No. 511) and ORDERS the appearing defendants to file a memorandum within two weeks of the date of this order showing (1) the date of default, (2) which government claimants had a lien on that date, (3) the value of those governmental liens, and (4) the legal viability of those claims, particularly the workers' compensation category. The Court then allows Travelers two weeks to file its response.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of September, 2023